**RESEARCH INSTITUTE FOR MEDI-CINE AND CHEMISTRY, INC., Plaintiff,**

**v.**

**WISCONSIN ALUMNI RESEARCH FOUNDATION, INC., Defendant.**

**No. 85–C–1060.**

United States District Court,
W.D. Wisconsin.

Nov. 4, 1986.

Foley & Lardner, Madison, Wis. (Goldstein & Manello, Boston, Mass., of counsel), for plaintiff.

Ross & Stevens, S.C., Madison, Wis. (Haight, Hofeldt, Davis & Jambor, Chicago, Ill., of counsel), for defendant.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

This case involves defendant's (WARF) three patents for two medically efficacious vitamin $D_3$ derivatives, their invention, manufacture and use. In count I of its amended complaint, plaintiff (RIMAC) seeks a declaration of patent invalidity, voidness, and unenforceability. Defendant has moved under Fed.R.Civ.P. 12(b)(1) to dismiss count I for lack of subject matter jurisdiction. It argues there is no case or controversy. In this opinion I address this motion.[1]

Part I of this opinion will define the question which must be answered in order to decide defendant's Rule 12(b)(1) motion. Part II will discuss the manner in which a trial court should arrive at the answer to that question: whether by looking only to the allegations of the complaint; whether by engaging in fact-finding; if by engaging in fact-finding, whether now or at trial; if now, whether on the basis of affidavits, depositions, or courtroom testimony. In part II, also, there will be considered what bearing *Malak v. Associated Physicians, Inc.*, 784 F.2d 277 (7th Cir.1986), may have on whether this Rule 12(b)(1) motion should be treated as if it had been based expressly on Rule 12(b)(6) and, if so, whether it should then be converted further and treated as if it had been based expressly on Rule 56. Part III(A) will include a summary of the allegations of the amended complaint and part III(B) will consist of findings of fact. In part IV, I will proceed to decide the pending motion.

## I. DEFINITION OF THE QUESTION TO BE ANSWERED

Defendant's motion requires interpretation and application of article III, section 2 of the Constitution of the United States, which provides that the judicial power of the courts of the United States "shall extend to all Cases, in Law and Equity, arising under ... the Laws of the United States ...; to Controversies ... between Citizens of different States...." With respect to suits of a civil nature, the meanings of "case" and "controversy" are identical. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937).

It might appear that because count I seeks a declaratory judgment, because it is an act of Congress (28 U.S.C. § 2201(a)) which authorizes federal courts to grant this form of relief, and because § 2201(a) permits a declaratory judgment to be entered only in "a case of actual controversy," I am required to engage in interpretation of this statutory phrase. But it has been decided authoritatively that the words, "a case of actual controversy," as they appear in § 2201(a), are a redundancy. Their meaning is identical to the meaning of a "case" or "controversy" as those words are used in article III, section 2. *Id.* at 240, 57 S.Ct. at 463.

It might appear also that I am required to decide whether count I is an action arising under an act of Congress relating to patents, 28 U.S.C. § 1338(a), or whether the

---

1. I will decide shortly, in a separate opinion, defendant's Rule 12(b)(1) motions to dismiss counts II (unfair competition in violation of Wisconsin law), III (violation of Lanham Act), and IV (violation of federal antitrust laws).

matter in controversy exceeds the value of $10,000, exclusive of interest and costs, and is between citizens of different states. 28 U.S.C. § 1332. Even though count I may present a "case" or "controversy" within the meaning of article III, section 2 of the Constitution, this court would enjoy no power to decide it unless it falls as well within the jurisdiction granted by Congress in §§ 1338(a) or 1332. However, there is no contention by defendant, and there could be none, that count I does not fall within both §§ 1338(a) and 1332.

Therefore, defendant's motion under Rule 12(b)(1) to dismiss count I because it presents no case or controversy requires solely the interpretation and application of a constitutional provision.

A case or controversy "must be one that is appropriate for judicial determination." It is to be distinguished "from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot." It "must be definite and concrete, touching the legal relations of parties having adverse legal interests." It "must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* at 240–41, 57 S.Ct. at 463–64. The question "is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy." *Maryland Casualty Co. v. Pacific Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

Whether the action in question is for damages based on injury from past conduct or for an injunction to prevent injury from future conduct, or for a declaratory judgment to govern future conduct, the essence of the test is the same: definiteness, reality, and substantiality of the controversy. But the difficulty in applying so imprecise a test is compounded when a predictive, rather than historical, exercise is required.

The history of the Declaratory Judgments Act, 28 U.S.C. § 2201, has been traced frequently. 10A Wright, Miller and Kane, *Federal Practice and Procedure* §§ 2752–2753 (1983); 6A *Moore's Federal Practice* ¶¶ 57.02–57.04 (1986). Among the persons considered most deserving of access to declaratory relief were those privately charged with patent infringement or threatened by patentees with infringement suits. The reality of the negative economic impact of such conduct by patentees has been graphically described, as has been the virtual helplessness of the victims of such conduct, when the conduct is unjustified, in the absence of the availability of declaratory relief. *See* Borchard, *Declaratory Judgments* 802, 803 (2d ed. 1941); *Wembley, Inc. v. Superba Cravats, Inc.,* 315 F.2d 87, 89 (2d Cir.1963); *Dewey & Almy Chemical Co. v. American Anode, Inc.,* 137 F.2d 68, 69–70 (3d Cir.), *cert. denied,* 320 U.S. 761, 64 S.Ct. 70, 88 L.Ed. 454 (1943); *Treemond Co. v. Schering Corp.,* 122 F.2d 702, 703–705 (3d Cir.1941). Actions seeking declaratory judgments of patent invalidity fall within one of the categories of litigation in which there has been some reduction in the imprecision of the article III, section 2 test for the presence or absence of a case or controversy. In this category, this reduction has been accomplished by the Court of Appeals for the Federal Circuit.

Created in 1982, the Federal Circuit decided in *C.R. Bard, Inc. v. Schwartz,* 716 F.2d 874, 879 (Fed.Cir.1983), that under 28 U.S.C. § 1295(a)(1), it enjoys exclusive jurisdiction to decide whether a federal district court enjoys jurisdiction in a case if the putative jurisdiction of the district court is based in whole or in part on 28 U.S.C. § 1338. The Federal Circuit decided that the district court did enjoy jurisdiction in that action seeking a declaratory judgment of patent invalidity. Essential to the jurisdictional ruling was a determination that a case or controversy was present, within the meaning of article III, section 2. In *Bard* there was no diversity of state citizenship; jurisdiction in the federal district court could have been granted only by § 1338. In the present case in this court,

jurisdiction as to count I is invoked both under 28 U.S.C. § 1338 and 28 U.S.C. § 1332 (diversity of state citizenship). Nevertheless, I view the pronouncements of the Federal Circuit as binding on me in determining the presence or absence of a case or controversy in actions for a declaratory judgment of patent invalidity. *Christianson v. Colt Industries Operating Corp.*, 798 F.2d 1051, 1061 (7th Cir.1986).

Within the general category of actions for declaratory judgments of patent invalidity lies a subcategory in which the plaintiff is a manufacturer and another in which the plaintiff is a non-manufacturer-licensor.[2] In the subcategory in which plaintiff is a manufacturer, the authoritative decision is *Indium Corp. of America v. Semi-Alloys, Inc.*, 781 F.2d 879 (Fed.Cir. 1985), *cert. denied,* — U.S. —, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986). In the subcategory in which plaintiff is a non-manufacturer-licensor, there is no authoritative decision. I propose to employ *Indium* as a highly significant guide, but no more, in an effort to formulate a test to determine the presence or absence of a case or controversy, within the meaning of article III, section 2, in cases in which the plaintiff is a non-manufacturer-licensor.

The competing interests to be addressed in that effort include: plaintiffs' interest in gaining access to judicial determinations whether challenged patents are valid; and defendants' interests in avoiding adjudication of the validity of patents until and unless the patentees desire adjudication, and in avoiding litigative costs in money, time, and diversion of energy. The court's response must reflect the public's interests. Within its prescribed jurisdictional limits, e.g., 28 U.S.C. § 1338, the court's doors should be open to plaintiffs seeking the resolution of definite, real, substantial con-

troversies; the parties to such controversies should not suffer diminution of the court's attention by the demands of parties to conflicts which are vague, hypothetical, and trifling. The latter public interest coincides to a degree with defendants' interest: like the court, defendants should be spared the burden of responding to suits when the conflicts are vague, hypothetical and trifling. However, defendants' interest in simply avoiding adjudication of the validity of their patents coincides with no public interest. Also, if the controversy is genuine, defendants' interest in avoiding the costs of defense in patent cases is no more deserving than the similar interest of defendants in litigation generally.

*Indium* prescribed a two-prong test to determine the presence or absence of a case or controversy:

> In the case of an action seeking a declaratory judgment of patent invalidity or noninfringement, the actual controversy requirement is satisfied [1] when a defendant's conduct has "created on the part of the declaratory plaintiff a reasonable apprehension that it will face an infringement suit if it commences or continues the activity in question" and [2] when the plaintiff has "actually produced the accused device" or has "prepared to produce such a device." *Jervis B. Webb Co. v. Southern Systems, Inc.*, 742 F.2d 1388, 1398–99, 222 USPQ 943, 949 (Fed. Cir.1984). The test is an objective one— reasonable apprehension, like other jurisdictional prerequisites, must exist at the time the suit is filed. *Id.* A purely subjective apprehension of an infringement suit is insufficient to satisfy the actual controversy requirement.

781 F.2d at 882–83.

The *Indium* test is consciously tailored to the subcategory in which the declaratory

---

**2.** The list of subcategories and sub-subcategories is doubtless endless. For example, in *Bard,* the declaratory plaintiff was a manufacturer which was licensed by the defendant under the challenged patent. *Bard's* principal bearing on the present case is its holding, noted *supra,* that the Court of Appeals for the Federal Circuit enjoys exclusive jurisdiction to decide whether a feder-

al district court enjoys subject matter jurisdiction in this or that action for a declaratory judgment of patent invalidity. However, *Bard's* holding on the presence or absence of a case or controversy in the particular circumstances before it also offers indirect guidance in the present case, as will be noted *infra.*

plaintiff is a manufacturer. The declaratory plaintiff is obliged to show apprehension on its part that it—no one else—will be sued by defendant for infringement if plaintiff—no one else—commences or continues to manufacture an accused device. The declaratory plaintiff is obliged to show also that it—no one else—has actually produced the accused device or, if not, that it has prepared, itself, to produce it.

This test is sensible and workable. Aware that a device may fall within the claims of another's patent, believing the patent invalid, unwilling to seek a license from the patentee, the manufacturer is master of its fate. It knows the degree of its capability to manufacture the device, in terms of capital, physical plant and equipment, labor force, skill, and so on. It can estimate the profit to be reaped if it does engage in the manufacture. It can evaluate whether the patentee will sue it for infringement, the expense of defending such a suit, the duration of the suit, the chance for success and the financial consequences of failure in the suit. It can evaluate whether to commence an action for a declaratory judgment of invalidity. Specifically, knowing the courts' insistence that it show it has prepared to commence manufacture, it can attempt to calibrate the minimal degree of preparation which will be considered sufficient to create a case or controversy for the purpose of article III, section 2. It can decide whether it is willing to risk the sum required for that degree of preparation.

When a non-manufacturer-licensor surveys a comparable scene, however, it is not the master of its fate. It must find in a potential licensee the capability to manufacture. Independently of the potential licensor, the potential licensee-manufacturer must estimate the profit it may reap, which profit will depend in part on the market demand for the device and on the terms of the licensing agreement to be negotiated. The potential licensee and the licensor must make independent evaluations of whether the potential licensee will be sued for infringement, whether the licensor will be sued for inducement of or contribution to an infringement, the expense of defending, the duration of the suit, and the chance for success in the suit and the financial consequences of defeat. When the licensor considers whether to commence an action for a declaratory judgment of invalidity, it may be in a good position to demonstrate its own steadfast purpose to license a manufacturer and to promote manufacture, but it cannot directly control the potential licensee's decision whether to engage in manufacture or even whether to spend the sum required to permit a declaratory plaintiff to persuade a court that sufficient preparation to manufacture has occurred. The fortunes of the non-manufacturer-licensor are critically affected by conduct on the part of the putative declaratory defendant patentee which affects the willingness of the potential licensee-manufacturer to move forward with the project.[3]

*Indium's* first prong is that defendant's conduct must have created on the part of

**3.** Although I lack sophistication in the world of patents, the denizens of that realm possess it in large measure. I am sure that the stark contrast I have drawn between the cases of the manufacturer *declaratory plaintiff* and the non-manufacturer-licensor declaratory plaintiff is subject to massive alteration by imaginative arrangements, including provision of risk capital by the licensor to the prospective licensee and indemnification commitments by the licensor. However, I adhere to the pristine contrast for the purpose of fashioning a test to determine the presence or absence of a case or controversy when the declaratory plaintiff is a non-manufacturer-licensor. In a given case the application of the test may be affected by the improvisation in which the actors have engaged.

I appreciate too that a manufacturer which lacks its own system of distribution from factory to ultimate user or consumer must obtain participation by others as distributors. The fortunes of a manufacturer are critically affected by conduct on the part of the putative declaratory defendant patentee which affects the willingness of potential distributors to move forward with the project. It may be that the *Indium* test requires modification addressing this phenomenon even in the subcategory in which a manufacturer is the declaratory plaintiff. But the plight of the non-manufacturer-licensor is more extreme. Nothing can occur in the cycle of making, selling or using, 35 U.S.C. § 271(a), without the participation of others.

the manufacturer declaratory plaintiff a reasonable apprehension that it will face an infringement suit if it commences to manufacture the device. This requirement can be imported without change into the subcategory of actions by non-manufacturer-licensors. However, a licensor-plaintiff may suffer an additional kind of injury. If defendant's conduct has created on the part of a potential licensee-manufacturer an apprehension that it will itself face an infringement suit if it commences to manufacture, such apprehension may operate as a substantial factor in an unwillingness on the part of the potential licensee-manufacturer to enter into a licensing arrangement with plaintiff and to commence manufacture. Standing alone, a non-manufacturer-licensor's reasonable apprehension that it will face suit for contributing to or inducing an infringement is sufficient to meet the first prong of the *Indium* test. An unwillingness on the part of a potential licensee-manufacturer to enter into licensing arrangements with plaintiff and to commence manufacture should also be sufficient, standing alone, to meet the first prong of the *Indium* test, if a substantial factor in that unwillingness is an apprehension on the part of the potential licensee-manufacturer, caused by defendant's conduct, that it will itself face an infringement suit if it commences manufacture.

*Indium's* second prong is that the manufacturer declaratory plaintiff must either have actually manufactured the accused device or have prepared to manufacture it. Either of these alternatives is sufficient. The first alternative can be imported with slight change into the subcategory of actions by non-manufacturer-licensors; the only modification need be that plaintiff's licensee-manufacturer, rather than plaintiff, has actually manufactured the accused device. However, when the device has not actually been manufactured and it is necessary to consider whether the degree of preparation for manufacture has infused the controversy with sufficient definite-

ness, reality, and substantiality, *Indium's* second prong requires more extensive modification.

Even when the declaratory plaintiff is a manufacturer, the requirement that it have prepared to manufacture the device is anomalous. The very purpose of making declaratory relief available in a proper case is to spare a plaintiff financial losses it may incur if it is forced to proceed into a situation in which its legal rights and duties are uncertain. But a manufacturer contemplating a declaratory action can make its own guess as to how much it must spend now on preparations solely to survive the *Indium* requirement of seriousness of purpose, and then can decide for itself whether to spend that sum. However, to impose upon a non-manufacturer-licensor declaratory plaintiff a requirement to show that sufficient preparations by a manufacturer have been made is to impose an unreasonable burden.[4] In the absence of a consummated licensing arrangement, it is unrealistic to suppose that a potential licensee-manufacturer will invest funds in preparations to manufacture, for no present purpose other than to permit the potential licensor declaratory plaintiff to persuade a court of the definiteness, reality, and substantiality of the potential licensor's conflict with the defendant. This would be true even if the minimal sum is known; it is accentuated when it can be foreseen that a court may decide that the expenditure of a certain sum has been insufficient to meet the jurisdictional test. Even in the unlikely event that, prior to an adjudication on the validity of a declaratory defendant's patent, it is possible for a licensor declaratory plaintiff and a manufacturer to consummate a licensing agreement, it is unrealistic to suppose that the manufacturer will presently invest its own funds in preparations for manufacture, solely to permit the licensor-plaintiff to gain access to court.

Of course, it is possible to conclude that there should be no judicial accommodation

---

**4.** I assume, I am sure correctly, that the time, effort, and money expended earlier in developing a process of manufacture and obtaining a patent on it is not the kind of preparation for manufacture contemplated in the *Indium* test.

to this difficulty. I see no justification, however, for holding that non-manufacturer-licensors, generally (WARF is a conspicuous example), simply cannot demonstrate the existence of a case or controversy sufficient to support subject matter jurisdiction in actions brought by them for declaratory judgments of patent invalidity. A practical accommodation can be achieved by requiring only a showing of probability that the potential licensee-manufacturer will commence manufacture, assuming the consummation of a licensing agreement between the licensor and the potential licensee-manufacturer, and assuming judicial elimination of the prospect of an infringement suit by defendant.[5]

I propose to apply the *Indium* test, modified as follows:

In an action by a non-manufacturer potential licensor seeking a declaratory judgment of patent invalidity, the case or controversy requirement of article III, section 2 of the Constitution is satisfied

(1) (a) when a defendant's conduct has created on the part of the declaratory plaintiff a reasonable apprehension that it will face an infringement suit if a potential licensee of plaintiff commences the activity in question; or

(b) when there is an unwillingness on the part of a potential licensee-manufacturer to enter into a licensing agreement with a declaratory plaintiff and to manufacture the device, and a substantial factor in that unwillingness is an apprehension on the part of the potential licensee-manufacturer, caused by defendant's conduct, that it will itself face an infringement suit if it commences manufacture;

and

(2) (a) when plaintiff's licensee-manufacturer has actually manufactured the accused device; or

(b) it is probable that a potential licensee-manufacturer will commence manufacture, assuming the consummation of a licensing agreement between the licensor and the potential licensee-manufacturer, and assuming judicial elimination of the prospect of an infringement suit by defendant.

With respect to 2(b), to show the probability manufacture will occur, plaintiff would be required to show the physical capacity of the licensee-manufacturer to produce the device and to show the necessary market demand for the device. I believe it is proper to build in an assumption that a licensing agreement would be consummated. A contrary assumption would deny access to declaratory relief in this entire subcategory of declaratory judgment actions. To make no assumption in either direction would be to require proof. Inevitably that proof would be to the effect that if other factors—such as market demand and the licensee's physical capacity to manufacture—favored consummation, a licensing agreement would probably be consummated if its terms were reasonable to both parties. Objective standards of prediction of economic behavior support the probability that in such a context, the self interest of the negotiating parties would cause a licensing agreement to emerge.

*Indium's* emphasis in section (1)(a) of this test upon apprehension on the part of the declaratory plaintiff requires comment. Among the meanings of "apprehension" are: a perception resulting from an act of learning, and a fear. *Webster's Third New International Dictionary* (1971). The former is the meaning relevant here. Emotions such as fear are not absent from the marketplace. But rules of law applicable to the market are more wisely geared to an assumption that costs and benefits are perceived and weighed rationally by most participants most of the time.

---

**5.** I am fortified in this view by the Federal Circuit's approach in *C.R. Bard, Inc. v. Schwartz* in the course of rejecting a flat rule that unless a patent licensing agreement has been terminated, no case or controversy is present when a licensee sues a licensor for a declaratory judgment of invalidity or non-infringement. 716 F.2d 874. The court observed that such a flat rule would discourage licensees from contesting patent validity and would be contrary to the policies expressed in *Lear v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). *Id.* at 880.

The more familiar standard for judicial resolution of issues focuses on "apprehension" (in the sense of a perception resulting from an act of learning) on the part of a court. That is, to determine the presence or absence of a case or controversy in an action like that described in count I, a standard might have been selected looking simply to whether the facts presented to the court in compliance with the rules of evidence are sufficient to persuade the court: that if plaintiff and a potential licensee enter into a licensing arrangement and the licensee then commences the activity in question, it is probable that the patentee will sue the licensor for contributing to or inducing an infringement. *Indium* pointedly rejects this approach. It directs inquiry to apprehension, not on the part of the court, but on the part of the declaratory plaintiff as an actor in a business setting.[6]

*Indium* is at pains to emphasize that the apprehension must be more than subjective, however genuine. It must be objectively reasonable. I take the test to be how most business people in the position of the declaratory plaintiff would react to the information plaintiff might reasonably be expected to have gathered at the time. The accent is on information, the nature, sources and quantity of which are the sort upon which business people normally rely in making decisions. Business people are not bound by rules of evidence. They do not leave it to others to resolve issues of credibility. They learn from experience. They develop intuition. A perceived threat of an infringement suit is real if it would be a substantial factor for most business people in their choice to proceed in one direction and not in another.

The considerations which prompted passage of the Declaratory Judgments Act and rendered it peculiarly appropriate in patent litigation continue today to justify emphasis upon those apprehensions of declaratory plaintiffs shown to be reasonable in a business world. This is the path to testing the definiteness, reality, and substantiality of controversy required by article III, section 2. While the availability or unavailability of federal district courts to resolve this or that category of conflicts is a significant matter, nothing more threatening to a declaratory defendant is presently at stake. It is not necessary that the evidence received in court, having survived the rules of evidence, persuade the court itself that the declaratory plaintiff probably will be sued by the declaratory defendant if plaintiff's licensee-manufacturer commences manufacture.

## II.  MANNER IN WHICH THE QUESTION IS TO BE ANSWERED

Rule 12(b)(1) motions are dealt with in a variety of ways. The hearing and determination may occur before trial or at trial. Because they go to jurisdiction, early determination is generally preferable. Some are decided by looking only to the complaint. Some are the subject of early evidentiary hearing and fact-finding. Some are treated as if they had been filed under Rule 12(b)(6); within this latter category, some are converted to Rule 56 motions. *See* 2A *Moore's Federal Practice* ¶ 12.-07[2.–1] (1986); 5 Wright, Miller & Kane, *Federal Practice and Procedure* § 1350 (1969 & 1986 supp.).

Although the efforts of courts and commentators have left the point obscure, it appears that even when a declaratory plaintiff in a patent case has met the burden under article III, section 2 and subject matter jurisdiction is thus established, and even when invalidity of the defendant's pat-

---

**6.** In *C.R. Bard* on August 30, 1983, the Federal Circuit pronounced its exclusive authority to pass on the presence or absence of subject matter jurisdiction in district courts in cases arising under the patent laws. In *Jervis B. Webb Co. v. Southern Systems, Inc.,* 742 F.2d 1388 (Fed.Cir. August 16, 1984), it stated the authoritative test for the presence or absence of a case or contro- versy in actions by manufacturers for declaratory judgments of patent invalidity. In *Indium,* on December 26, 1985, it repeated the *Jervis B. Webb Co.* expression of the test, explicitly and approvingly. The circumstances demonstrate that the decisive emphasis upon the declaratory plaintiff's apprehension was settled upon with more than usual care and precision.

ent has been shown, there remains discretion in the court to refrain from issuing a declaratory judgment. *See International Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1217 (7th Cir.1980). There is not perfect congruence between the showing necessary to establish the presence of a case or controversy, and thus subject matter jurisdiction, on the one hand, and, on the other, the showing necessary to persuade a court in its discretion to grant declaratory relief when invalidity or non-infringement is established. However, it appears that the entire showing necessary to the existence of a case or controversy is relevant to the question whether the court should choose to grant declaratory judgment. In such a circumstance, it is doubtful that when a 12(b)(1) motion is based on evidentiary materials challenging the truth of the allegations of the amended complaint bearing on the presence of a case or controversy, the court should proceed at once to engage in a mini-trial—as, for example, it would probably proceed when diversity of state citizenship is the sole basis of jurisdiction and defendant supports a Rule 12(b)(1) motion with evidence to disprove the state citizenship alleged—and compel plaintiff at this early stage to meet its burden of proof.

One alternative is to decide this type of Rule 12(b)(1) motion by looking only to the allegations of the amended complaint. This is the manner in which the court is to administer Rule 12(b)(1) motions made on the ground that the action does not arise under the Constitution, laws or treaties of the United States. *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). This seems the preferable course. A second alternative is to proceed with a factual inquiry prior to trial, but to demand of the plaintiff less in the way of jurisdictional proof than would be appropriately demanded at trial. *See Mortensen v. First Federal Sav. and Loan Ass'n*, 549 F.2d 884, 892 (3d Cir.1977). A third alternative is to proceed with a mini-trial, imposing upon plaintiff the full burden of proof which it would bear if the issues were integrated with the remaining issues at trial. A fourth alterna-

tive is to defer until trial the hearing and determination of the jurisdictional question.

A fifth alternative is that prescribed in *Malak v. Associated Physicians, Inc.*, 784 F.2d at 279–81. *See* 2A *Moore's Federal Practice* ¶ 12.07[2.–1] at 12–50—12–52 (1986). It is to treat the Rule 12(b)(1) motion as if it had been brought expressly under 12(b)(6), and, if the court does not exclude matters outside the complaint, to treat it as if it had been brought expressly under Rule 56. *Malak* requires this procedure when the Rule 12(b)(1) challenge to the court's subject matter jurisdiction is also a denial of the presence of an element of a federal cause of action. In *Malak*, the issue was whether the acts undertaken by the defendants constituted state action, an element of causes of action created by 42 U.S.C. § 1983, and also an element necessary to jurisdiction under 28 U.S.C. § 1331. For reasons I have stated, the present case is not a perfect parallel to *Malak*. The showing plaintiff must make here to prove the existence of a case or controversy within the meaning of article III, section 2 is all directly relevant to whether a declaratory judgment should issue, but an even further showing, similar but not identical in nature, may be required to persuade the court, in the exercise of its subject matter jurisdiction, that its discretionary choice should be to grant declaratory relief. Nevertheless, the factors dictating the choice of procedure here resemble those in *Malak*.

Because the Court of Appeals for the Federal Circuit enjoys exclusive jurisdiction to decide whether a case or controversy is present in a particular action for a declaratory judgment of invalidity of a patent, its views must be authoritative on the manner in which a district court is to proceed when a defendant moves under Rule 12(b)(1) for dismissal because of the absence of a case or controversy. No clear direction can be drawn from the recent decisions of the Federal Circuit.

In *C.R. Bard*, for example, the defendant patentee filed a motion to dismiss the declaratory judgment action and filed an affidavit in support. 716 F.2d at 881. It can-

not be discerned from the published opinion of the court of appeals (the district court decision is unpublished) whether the motion was made pursuant to Rule 12(b)(1), but this seems probable, since the supporting affidavit was to the effect that defendant had no intention to terminate the licensing agreement or to sue for infringement. The district court relied on the affidavit in granting the motion to dismiss. *Id.* at 876. The court of appeals reversed, holding that even though the licensing arrangement between defendant and plaintiff had not been terminated, a case or controversy was present. It remanded for further proceedings. Thus, *C.R. Bard* appears to be a case in which, in advance of trial, a district court took up a Rule 12(b)(1) motion in a declaratory action for patent invalidation, received and considered evidence outside the pleadings, and decided the motion on its merits. Although the court of appeals disagreed with the district court's conclusion, it did not criticize the procedure followed below, it did not remand for further proceedings and fact-finding on the jurisdictional issue, and it proceeded itself to decide that jurisdictional issue on the record as then developed.

In *Jervis B. Webb* a plaintiff patentee sued a defendant for infringement of certain claims of the patent. Defendant counterclaimed for a declaratory judgment that certain other claims of the patent were invalid. From the published opinion of the court of appeals (the district court decision is unpublished), it cannot be ascertained whether plaintiff moved under Rule 12(b)(1), or on some other basis, that the counterclaim should be dismissed. The district court proceeded to decide the case on its merits, holding all of the claims invalid. On appeal, the court of appeals affirmed as to the invalidity of some claims of the patent, but vacated the judgment as to the claims attacked by defendant's counterclaim. It held that the evidence in the record—presumably, the evidence adduced during the trial on the merits—did not support the presence of a case or controversy as to the claims challenged in the declaratory counterclaim. 742 F.2d at 1398–99.

From the published material in *Jervis B. Webb* it can be inferred only that when a subject matter jurisdictional issue is not dealt with prior to trial, the evidence presented at trial is looked to by the appellate court in order to determine the issue.

In *Indium* the Federal Circuit noted that in the district court, assertion of an absence of controversy "should have been raised" by a Rule 12(b)(1) motion, rather than by the Rule 56 motion for summary judgment, which the defendant had employed and the district court had granted; that in deciding a Rule 12(b)(1) motion a district court "can consider ... evidentiary matters outside the pleadings;" and that it can conduct a factual inquiry at that stage into the question of declaratory judgment jurisdiction. 781 F.2d at 883–84. I discern some implication it is preferable that prior to trial the motion should be addressed, evidence relevant to it should be received, and fact-finding should be performed.

I conclude that the safer course is: to hear and determine defendant's Rule 12(b)(1) motion now, rather than to defer hearing and determination until trial; to consider matters beyond the allegations of the amended complaint; to consider the evidence which has been presented in affidavit form, deposition form, and answers to interrogatories (Rule 43(e)); to assign to plaintiff the burden of persuasion; and to define the nature of the burden as proof by a preponderance of the evidence. The findings of fact (which appear as part III(B) of this opinion) reflect my resolution of disputed factual propositions and undisputed factual propositions adequately supported in the present record. My ruling will be based upon those findings of fact. This procedure works no unfairness on either party. In proceedings before the magistrate there has been considerable discussion of the manner in which defendant's Rule 12(b)(1) motion should be addressed and decided by the court. There has been some uncertainty and disagreement about the bearing of *Malak v. Associated Physicians, Inc.* upon the manner of the court's address and decision. However, the upshot

has been that each side has had full opportunity to present all the evidence it desires to present, in every form other than oral testimony, on the question whether a case or controversy is present.

In order to avoid uncertainty and delay in the event it is ultimately determined that I should have proceeded in another manner, I will proceed, in the alternative, to decide the present Rule 12(b)(1) motion by looking only to count I of the amended complaint, construing it most favorably to the plaintiff; and, as a further alternative, by deciding the present Rule 12(b)(1) motion as though it were a motion pursuant to Rule 12(b)(6) to dismiss count I of the amended complaint on the ground that it fails to state a claim upon which relief can be granted; and, as a final alternative, to treat the present Rule 12(b)(1) motion as if it were a Rule 12(b)(6) motion, but not to exclude matters which have been presented outside the amended complaint, and to treat it as if it were a Rule 56 motion for summary judgment. For reasons explained above, treating the motion as a Rule 56 motion works no unfairness on either party.

### III. FACTS

#### A. *The allegations of the amended complaint*

Plaintiff and defendant are engaged in the business of sponsoring scientific research and licensing the fruits of that research to others in the area of medically efficacious derivatives of vitamin $D_3$ (known as cholecalciferol). Defendant owns the three United States patents-in-suit: one of which (no. 3,697,559 (the '559 patent)) claims a vitamin $D_3$ derivative known as 1,25–dihydroxycholecalciferol (1,25–DHCC); another (no. 3,741,996

(the '996 patent)), a vitamin $D_3$ derivative known as 1 alpha-hydroxycholecalciferol (1 alpha-HCC) and a process for its manufacture; and the third (no. 4,225,596 (the '596 patent)), a method for treatment of a metabolic bone disease.[7] Defendant has obtained counterpart patents in various countries. Defendant licenses a number of companies to manufacture 1,25–DHCC and 1 alpha-HCC and to practice the method of treatment. Plaintiff is the owner of a United States patent (no. 3,901,928 (the '928 patent)) directed in part to a process for manufacture of 1,25–DHCC and 1 alpha-HCC, and is the owner of patent applications which disclose and claim 1 alpha-HCC and the method of treatment.

Defendant's three patents-in-suit are invalid, for various stated reasons.

Defendant's position is that no commercial manufacture, use or sale of its patented compounds and process may proceed without license by defendant. Defendant aggressively enforces its patent rights. As to vitamin $D_3$ derivatives, defendant has prevented in the past and will effectively prevent in the future the grant of any license in the technology reflected in plaintiff's patents on the ground that the inventions or uses, or both, embodied in plaintiff's patents were anticipated by and would infringe defendant's patents-in-suit. Defendant earns about $3 million a year in licensing revenues from the patents-in-suit.

Plaintiff has invested substantial amounts of time and money in discovering, refining, testing and marketing or attempting to market the inventions in its United States and foreign patents and patent applications for highly efficient processes for the manufacture of 1 alpha-HCC and 1,25–DHCC, and methods of treatment using patented vitamin $D_3$ derivatives. Defend-

---

**7.** In the amended complaint, plaintiff alleges that the '559 patent does not describe or claim any single, unique compound; that the expression "1,25–DHCC" is equally applicable to three possible materials (1 beta, 25–DHCC; 1 alpha, 25–DHCC; or a mixture of the two); and that the medically efficacious, naturally-occurring derivative is 1 alpha, 25 dihydroxycholecalciferol (1 alpha, 25–DHCC). The amended com-

plaint proceeds to use, in quotes, the expression "1,25–DHCC." In this opinion, I imply nothing concerning the validity of the plaintiff's criticism of the nomenclature used in the patent. Both in the course of summarizing the allegations of the amended complaint in this section I(A), and in the findings of fact appearing in I(B), I simply employ the nomenclature used in the defendant's patent.

ant and plaintiff compete in offering licenses to pharmaceutical companies for the commercial manufacture, use and sale of 1,25–DHCC and 1 alpha-HCC and the method of treatment. With the possible exception of a Dutch company, all commercial manufacturing and marketing in the world of 1,25–DHCC and 1 alpha-HCC and use of the method of treatment take place either pursuant to licenses from defendant, from plaintiff, or from both. Defendant's practice is to get as many licensees and as broad a licensing program as it can. In public statements and privately to plaintiff, defendant has consistently taken the position that its patent claims are strong and enforceable.

In 1977, on the basis of defendant's patents-in-suit, defendant filed opposition proceedings or a protest against plaintiff's applications in the United Kingdom, New Zealand, and Canada for counterparts to plaintiff's United States patent. In 1983, in response to plaintiff's efforts to expand its marketing in Europe, defendant told plaintiff that the parties could anticipate long and costly legal wrangling in West Germany and Holland. In 1983, in response to a Japanese Patent Office decision to publish a counterpart of plaintiff's United States patent in Japan and plaintiff's efforts to license Chugai Pharmaceuticals under that counterpart, defendant told plaintiff that, through Chugai, defendant had initiated an opposition proceeding against plaintiff's Japanese patent and planned to submit evidence to the Japanese Patent Office. Subsequently, defendant told plaintiff that defendant would terminate opposition proceedings against plaintiff's applications in exchange for a worldwide settlement.

Between 1982 and 1984 defendant attempted to coerce plaintiff to settle. Defendant expressed to plaintiff defendant's belief that defendant's actions were preventing plaintiff from licensing its patents in the United States. In 1982 defendant told plaintiff there might be further very substantial expenses in Great Britain and beyond if the parties did not reach settlement. Also in 1982 defendant told plaintiff that in exchange for a settlement, defend-

ant would agree that no other actions would be taken in any of the remaining countries in which both defendant and plaintiff had patents or patent applications, and that defendant would prospectively agree to take no further action against plaintiff's patent positions elsewhere in the world. Also in 1982 defendant told plaintiff that in exchange for defendant's agreement to initiate no other oppositions to plaintiff's patent position in other countries, plaintiff must agree to inform the United Kingdom Patent Office that plaintiff recognizes a certain proposition helpful to defendant's patent position. This latter condition to an agreement was restated by defendant to plaintiff in 1983. In 1984 defendant told plaintiff that if plaintiff settled with defendant, defendant would not initiate any new or additional actions similar to defendant's then-pending proceedings against plaintiff. These and other subsequent attempts to coerce a settlement were made by defendant in bad faith and for the purpose of delaying or prejudicing or precluding plaintiff's assertion of its legal rights and remedies.

Since 1973 plaintiff has been engaged in active efforts to promote the use of its '928 process and related processes, and to sell licenses for the manufacture, use and sale of 1,25–DHCC and 1 alpha-HCC and the method of treatment in the United States and abroad. Plaintiff has offered licenses to, and carried on domestic licensing discussions with, thirteen named pharmaceutical companies, and others unnamed. Since 1973 plaintiff has been prepared to, and has had the intent to exploit commercially its '928 and related patents in the United States and abroad. Each of the thirteen named companies has expressed concerns to plaintiff about defendant's patent position. They have noted that in order to engage in the commercial manufacture, use, or sale of 1,25–DHCC or 1 alpha-HCC in the United States, using plaintiff's patented process or method of treatment, they would be required to obtain licenses from both defendant and plaintiff. They have told plaintiff that the costs and terms of

such multiple licensing would render development of the patented compounds and method uneconomical. They have taken the position that obtaining a license solely from plaintiff would be unacceptable because of a great risk that defendant would take legal action once the commercial manufacture, use, or sale commenced. In light of the substantial investment required to develop and market these compounds, none of plaintiff's potential licensees has been willing to assume the risk and none has taken a license from plaintiff, although negotiations with one of the companies has not terminated. The concerns of plaintiff's potential licensees have resulted directly from defendant's assertions of broad patent rights, defendant's claim of ownership of the compounds and method of treatment, *per se*, and the legal proceedings defendant has initiated against plaintiff around the world. In May 1983 defendant wrote plaintiff that plaintiff's current and potential licensees were "faced with an unresolved dispute and therefore a licensing dilemma." Plaintiff continues its attempt to find a domestic licensee willing to undertake the manufacture, use, and sale of 1,25–DHCC and 1 alpha-HCC, or of the method of treatment, but plaintiff's efforts have been unsuccessful for the reasons, set forth above, that were stated to plaintiff by the thirteen companies.

Plaintiff has an overseas licensee in Denmark and another in Japan. These licensees have manufactured and marketed 1 alpha-HCC pursuant to foreign patents and patent applications counterpart to plaintiff's '928 process. Plaintiff's arrangement with these licensees is much less favorable than it would be in the absence of defendant's patents and defendant's actions with respect to those patents. Defendant has made clear that its respect for plaintiff's Denmark license (plaintiff's licensee is also of a licensee of defendant) is contingent upon a settlement favorable to defendant.

Plaintiff's apprehension of defendant's infringement suit and the similar expressed apprehension on the part of plaintiff's potential licensees are reasonable. As a result of the potential licensees' expressed apprehension of defendant, plaintiff has not yet been able to obtain a United States licensee. Defendant does not view the prospect of competition from plaintiff in the United States or elsewhere as remote, hypothetical or academic. Defendant is not itself a producer of vitamin $D_3$ derivatives, has never itself been ready to manufacture and market such compounds, and has never had an intent to manufacture and market such compounds. Like plaintiff, defendant licenses others to undertake these activities, which can take place only if a prospective licensee is willing to undertake the substantial investment involved. Plaintiff has been the immediate target of defendant's opposition proceedings around the world and of other efforts by defendant to forestall competition in the market for technology respecting vitamin $D_3$ derivatives. As a result of defendant's actions, plaintiff's ability to compete in both the domestic and export markets has been seriously damaged. On the basis of defendant's conduct, plaintiff has a reasonable apprehension that if it were to obtain a licensee under its '928 or related patents, and unless the patents-in-suit are declared invalid, void or unenforceable, defendant would sue such licensee with claims that the licensee would be infringing upon defendant's patents-in-suit or would claim that plaintiff actually induced said infringement by the licensee, or would both bring such suit and make such claim.

### B. *Facts as found on the present record* [8]

Defendant owns the three United States patents-in-suit: No. 3,697,559 (the '559 patent), which claims the vitamin $D_3$ derivative, 1,25–dihydroxycholecalciferol (1,25–DHCC); no. 3,741,996 (the '996 patent), which claims the vitamin $D_3$ derivative, 1

---

**8.** I have not considered as evidence a number of documents which have not been authenticated in some appropriate manner, or which have not been identified in a manner permitting me readily to perceive their source or significance.

alpha-hydroxycholecalciferol (1 alpha-HCC) and a process for its manufacture; and no. 4,225,596 (the '596 patent), which claims a method for the treatment of a metabolic bone disease. Defendant also owns foreign counterpart patents to the '559 and '996 patents.

Plaintiff owns U.S. patent no. 3,901,928 (the '928 patent), which claims a different process for producing a number of compounds, including 1,25–DHCC and 1 alpha-HCC. The '928 patent does not claim a compound. The '928 process is a simple, efficient and economical method for the synthetic production of the vitamin $D_3$ derivatives. Because it is a synthetic process, plaintiff's '928 process differs from the organic process claimed by defendant's '996 patent and is more economical than the '996 process and any other process.

Plaintiff sponsors and conducts scientific research and licenses the fruits of that research to commercial pharmaceutical companies. It has spent $1,700,000 in its efforts to research, develop, and market its '928 process in the United States and abroad. Plaintiff's '928 process has undergone successful pharmaceutical and clinical experience in the United States and in other countries where plaintiff's licensees have obtained marketing approval. Plaintiff seeks domestic and foreign licensees to employ its '928 patent process for the production of 1,25–DHCC and 1 alpha-HCC. Defendant also seeks domestic and foreign licensees to manufacture the compounds claimed in its patents-in-suit. Neither plaintiff nor defendant manufactures the compounds claimed in defendant's patents-in-suit.

The compound 1,25–DHCC is currently approved for marketing in the United States, but 1 alpha-HCC has not been approved for domestic marketing. For the marketing of 1,25–DHCC a licensee need only demonstrate chemical and biological equivalence in applying for an Abbreviated New Drug Application. The marketing of 1 alpha-HCC should be approved in the United States without much delay or difficulty if a licensee were to seek initial approval for limited, well-documented use, as for the treatment of renal osteodystrophy or hypoparathyroidism, or where extensive toxicological and clinical data is already available from successful foreign marketing efforts.

It is the opinion of WARF's director of licensing, Marvin D. Woerpel, that: if someone were to sell 1 alpha-HCC in the United States at this time it would be obliged to pay royalties to WARF; and if the seller did not pay royalties to WARF, it would be infringing on WARF's '996 patent on the compound 1 alpha-HCC.

Plaintiff applied for foreign counterpart patents in the United Kingdom, New Zealand, Canada, and Japan. In 1977 defendant opposed plaintiff's patent applications no. 1,463,985 in the United Kingdom and no. 173064 in New Zealand. Defendant protested in 1977 the Canadian issue of a counterpart patent to plaintiff. Plaintiff's Japanese patent application no. 99837/74 was published for opposition purposes on January 10, 1983. The only opposition was filed March 9, 1983 by an agent of defendant's Japanese licensee. Reasons for the opposition were filed on June 9, 1983, and that documentation was sent to RIMAC's Japanese agent by the Japanese Patent Office on October 25, 1983. On February 24, 1984, plaintiff filed an answer to the opposition; the answer was refuted by defendant's licensee on July 24, 1984, and plaintiff filed a second answer on May 21, 1985.

A basis for defendant's opposition to and protest of plaintiff's counterpart patent applications was defendant's prior claims to the vitamin $D_3$ compound, 1 alpha-HCC, which was also claimed in plaintiff's applications. In the words of WARF's patent counsel, Howard W. Bremer, WARF submitted a "conflict" in the British opposition proceedings because WARF "... considered that the claim to the compound, per se, dominated and covered any physical form of the compound."

To promote its interests in the marketplace, RIMAC, through its vice president, Robert H. Hesse, and other officials, or its

agent Eugene Oliveto, has engaged in domestic licensing discussions with commercial pharmaceutical companies. In Oliveto's discussions with potential licensees from June 1, 1985, RIMAC has "offered indemnification to the licensees for any claims of patent infringement involving 1 alpha hydroxy Vitamin $D_3$ or 1 alpha 25 dihydroxy Vitamin $D_3$."

In 1974 plaintiff and representatives of The Upjohn Company discussed a licensing agreement based on RIMAC's patent applications in the United States. In their extended negotiations an Upjohn official investigated and evaluated the patent claims made by RIMAC and by WARF, and Upjohn and WARF drafted a mutually acceptable licensing agreement. However, RIMAC's offers were refused by Upjohn in mid–1975. Upjohn's manager for corporate technology licensing, Joseph K. Andonian, wrote to Hesse on June 4, 1975:

> [W]e simply can't afford the luxury of pursuing every good opportunity that presents itself. Instead, our management generally has to consider alternatives and allocate our limited resources to those most likely to justify the costs and risks of development from our vantage point.
>
> I would be a liar if I pretended I wasn't disappointed. But disappointment is the lot of those who labor at my profession, since by the very nature of things our successful negotiations are in the minority.

After Upjohn officials evaluated the competing WARF and RIMAC claims, Hesse was told by Andonian and another Upjohn official that it would be too costly for Upjohn to take a non-exclusive license from WARF and an exclusive license from RIMAC. Upjohn told Hesse that it would be bad policy to take a license solely from RIMAC because "in light of the patent situation . . . [it] might well invite a lawsuit from WARF." Upjohn said it was "unwilling to run such a risk."

In 1975 plaintiff also conducted negotiations with North American Philips (Philips-Roxanne, Inc.) and with Merck & Company, Inc., but no licensing agreements were reached. Negotiations with North American Philips broke off in 1976 after a Philips official told Hesse that a dual licensing arrangement with RIMAC and WARF would not be economical and "the company would not risk an infringement suit at the end of the investment road." Negotiations with Merck ended much the same way. On February 12, 1976, Merck officials and patent attorneys held an extensive meeting with WARF officials to discuss three areas of concern to Merck: Merck's interest in the "[h]uman vs. [a]nimal [a]pplications of the hydroxy derivatives of vitamin $D_3$"; the status of the RIMAC and WARF patents and licensing arrangements under those patents; and potential "RIMAC/Merck [c]ollaboration." But a Merck official later informed Hesse that a dual license arrangement was "not commercially viable" for Merck, and "if Merck manufactured vitamin $D_3$ derivatives under the RIMAC process without taking a license from WARF . . . he was certain that WARF would sue for infringement." To Merck, "such a risk was flatly against corporate policy."

In late 1978 U.S. Vitamin Corporation also refused to take a RIMAC license for the manufacture of 1,25–DHCC or 1 alpha-HCC, after U.S. Vitamin investigated WARF's opposition to RIMAC's counterpart patent application in the United Kingdom. A U.S. Vitamin official told RIMAC officials that "U.S. Vitamin could not get involved with any drug candidate that was under legal attack" and would not risk litigation with WARF.

Representatives of Ayerst Laboratories, a division of American Home Products Corporation, evaluated a licensing agreement in 1979 with RIMAC. They wanted to use 1 alpha-HCC or 1,25–DHCC made by the '928 patent process in combination with premarin or estrogen for domestic manufacture and sale for the treatment of osteoporosis, as claimed by a RIMAC patent application. Ayerst's patent attorneys studied WARF's opposition proceedings to the RIMAC counterpart application in the United Kingdom and Ayerst's vice presi-

dent at the time, Romano Deghenghi, understood that in WARF's opposition proceedings in the U.K. and New Zealand, WARF was asserting its patent rights to 1 alpha-HCC and 1,25–DHCC over the claims of RIMAC. After analyzing the patent situation, Ayerst decided that "use or sale of either 1–ALPHA–HCC or 1,25–DHCC would infringe one or the other of the WARF patents."

Ayerst's administrative vice president, Frank M. Corcoran, wrote Hesse on November 30, 1979, that Ayerst had decided not to take a license from RIMAC, having concluded that the investment required for development would be prohibitive. Ayerst found

> that the patent situation with respect to the sale of 1–ALPHA–HCC or 1,25–DHCC made by the method of the RIMAC patent or in combination with Premarin or Estrogen in accordance with the claims of a then-pending RIMAC United States patent application was too uncertain and that there was a substantial risk that undertaking licenses from RIMAC under its United States '928 patent or the pending applications would result in a patent infringement suit by WARF. ... For this reason, compounded by other considerations such as the high expenses involved in entering into any new drug field, AYERST did not take a license from RIMAC under RIMAC's patent.

RIMAC's discussions between 1980 and 1982 with Hoffmann-LaRoche Inc. were also unsuccessful in negotiating a licensing arrangement using RIMAC's '928 patent process. Roche had verbally agreed to enter an option contract with RIMAC and had told RIMAC that Roche considered the '928 process to be a more economical synthesis than WARF's process. However, Hesse and other RIMAC officers later learned that WARF refused to give Roche "permission on reasonable terms" to enter into the RIMAC agreement. During the time of its negotiations with RIMAC, Roche was licensed under one or more of WARF's patents to produce vitamin $D_3$ derivatives.

RIMAC has two foreign licensees which employ the '928 process in the manufacture of 1 alpha-HCC. Teijin, a Japanese firm, was licensed in 1975; Leo Pharmaceuticals of Denmark, also a WARF licensee, was licensed in 1978 by plaintiff.

In 1982 the parties began to discuss settlement of their differences. Defendant's patent counsel, Howard W. Bremer, wrote to plaintiff's British counsel, Michael J. Holmes, on June 4, 1982, regarding WARF's opposition to RIMAC's counterpart patent application in the United Kingdom. Bremer outlined WARF's position on settlement and closed by stating,

> The foregoing is made in the interest of avoiding the further very substantial expenses which would undoubtedly attach to continuing the opposition and revocation proceedings in the British Patent Office and beyond. Moreover, a settlement should serve to promote the use and licensing of 1a-hydroxycholecalciferol since current and potential licensees would not be faced with an unresolved dispute and therefore a licensing dilemma.

On September 13, 1982, Bremer again wrote Holmes about settlement. He stated that WARF "recognize[d] ... that, absent the opposition which WARF filed, RIMAC may very well have had its patent issue in the U.K." Bremer continued by suggesting that WARF "would be willing to ... agree that no other actions would be taken in any of the remaining countries where WARF and RIMAC both have patents or patent applications."

Holmes responded to Bremer by letter on October 4, 1982, to underscore RIMAC's interest in settlement and its intent to pursue challenges to WARF patents.

In letters to RIMAC's London attorney and president on November 12, 1982, May 16, 1983, and March 9, 1984, WARF's counsel and director of licensing reiterated their offer not to oppose RIMAC patent applications abroad by invalidation or opposition actions.

On May 16, 1983, defendant's director of licensing Woerpel wrote Maurice M. Pechet, plaintiff's president, regarding WARF's "Opposition to British Patent No. 1463985—RIMAC and Revocation Action by RIMAC Against British Patent 1359407 —WARF." Concerning their negotiations "for an equitable means of settling the differences that have arisen in our two patent positions relative to the compound 1a-hydroxycholecalciferiol [sic]," Woerpel wrote:

RIMAC's position has been that the settlement should incorporate the rights of both parties in countries outside the UK, as well as in the UK where opposition and revocation actions were begun.

Two recent events have made it more clear to WARF why RIMAC has taken that position. These are, the taking of a product license for West Germany, France, and the UK from RIMAC by our licensee, Leo Pharmaceuticals; and the publication in Japan of RIMAC's application 99837/74 with claims that overlap previously issued claims of WARF. As a result, we now can anticipate long and costly legal wrangling in West Germany, Holland, and over several RIMAC patent applications in Japan. WARF's earlier suggested plan to not oppose RIMAC in countries other than the UK as a condition of the UK settlement is certainly no longer tenable in view of the potentital [sic] Japanese conflict. This at minimum, will be unsettling to both our licensees and, at maximum, destructive to the considerable investment that each has made in readying the product for marketing. Therefore, it seems clear that a broad settlement that will prevent future legal disputes between the parties and allow for the orderly development of the product would be a much preferable solution.

Summarizing WARF's "expectations," Woerpel stated WARF's position "that legal conflicts between the parties should terminate everywhere, with the present interests of each party's licensees preserved." In that same letter, Woerpel informed Pechet that defendant planned to pursue opposition proceedings to plaintiff's Japanese patent No. 99837/74.

As of November 15, 1985, when this action was commenced, plaintiff apprehended that if it were to enter into a licensing agreement with a licensee-manufacturer, and if the licensee-manufacturer were to commence manufacture of 1,25–DHCC and 1 alpha-HCC, using plaintiff's process covered by its patent '928, defendant would sue the licensee-manufacturer for infringement of defendant's patents '559 and '996 and would sue plaintiff as a contributor to and inducer of the infringement. This apprehension on the part of plaintiff was reasonable. A number of manufacturers with whom plaintiff negotiated for licensing agreements as to plaintiff's '928 patent are capable of using the '928 process to manufacture 1,25–DHCC and 1 alpha-HCC. These manufacturers include: the Upjohn Company; North American Philips; Merck & Company, Inc.; U.S. Vitamin Corporation; Ayerst Laboratories, a division of American Home Products Corporation; and Hoffman-LaRoche Inc. Each of the six potential licensee-manufacturers became unwilling to enter into licensing arrangements with plaintiff; a substantial factor in that unwillingness was apprehension on the part of the potential licensee-manufacturer that if it commenced to manufacture 1,25–DHCC and 1 alpha-HCC, using the process covered by plaintiff's '928 patent, it would be sued by WARF for infringement of WARF's patents '559 and '996; this apprehension on the part of each of the six was caused by the conduct of the defendant.

The compounds 1,25–DHCC and 1 alpha-HCC have not been manufactured in the United States by use of plaintiff's '928 process. Plaintiff has invested substantial time, effort and money in the development of its '928 process and no further development is required to permit its use in the manufacture of 1,25–DHCC and 1 alpha-HCC. The market demand for 1,25–DHCC and 1 alpha-HCC is high. Plaintiff's '928 process affords significant advantages to those who would engage in the manufacture of 1,25–DHCC and 1 alpha-HCC. No

manufacturer has made the expenditure of time, effort and money necessary to prepare completely, up to the point of actual manufacture, for the manufacture of 1,25–DHCC and 1 alpha-HCC in the United States, using plaintiff's '928 process. Assuming judicial removal of the threat of an infringement suit by WARF against those who would manufacture 1,25–DHCC and 1 alpha-HCC in the United States, using plaintiff's '928 process, and assuming the consummation of a licensing arrangement between plaintiff and such a manufacturer, it is probable that one or more of such licensees-manufacturer, such as the Upjohn Company, North American Philips, Merck & Company, Inc., U.S. Vitamin Corporation, Ayerst Laboratories, or Hoffman-La-Roche Inc., would proceed with such manufacture in the United States.

## IV.  DECISION

■ I appreciate that neither party could have anticipated that in the course of deciding defendant's Rule 12(b)(1) motion, I would undertake expressly to formulate a test that differs in some respects from the form in which the Federal Circuit expressed a test in *Indium*. If, at the time the parties made their submissions on the Rule 12(b)(1) motion, they had had in hand the exact test I have formulated, it is probable that the form of the submissions, and to some extent their content, would have been different.  For example, as to 2(b) of the test I have formulated, bearing on the probability of manufacture in the United States, using plaintiff's '928 process, plaintiff might have been at greater pains to amplify the profit-making potential of 1,25–DHCC and 1 alpha-HCC at a time when public consciousness of osteoporosis has been raised, and the physical capacity of various potential licensees actually to manufacture the derivatives, using the '928 process.  I acknowledge I have been quite liberal in respects such as these in drawing inferences favorable to plaintiff.  However, from my own general awareness, I am quite confident that my findings in these respects conform to reality.  Except for a few items of the sort just mentioned, I

believe that my modifications of the *Indium* test call for no significant kinds or amounts of evidence that are not demanded by the test just as it was stated in *Indium*, such as the reasonableness of plaintiff's apprehension that it would face suit by defendant for contributing to or inducing an infringement.

The definition of the test in part I of this opinion and the content of the findings of fact in part III(B) obviously require denial of defendant's Rule 12(b)(1) motion.  Little further explication is required.  So this part IV will be confined to a few comments on how I arrived at certain of the concluding and critical findings that appear at the end of III(B), and to a statement of the result I would reach if I were not to engage in straight fact-finding in the course of deciding defendant's Rule 12(b)(1) motion at this stage of this lawsuit and were to engage in some alternative manner of decision-making.

### A.  *Based on facts found in III(B)*

I have found that RIMAC has shown by a preponderance of the evidence that as of November 15, 1985, it apprehended, reasonably, it will face suit by WARF for contributing to and inducing infringement of defendant's patents if a licensee of RIMAC uses RIMAC's '928 process in the United States to manufacture 1,25–DHCC or 1 alpha-HCC, while not under license from WARF.  WARF's general vigilance as to its rights as owner of various patents is adequately documented.  More specifically, WARF's aggressiveness as to its patents '559 and '996 is demonstrated, among other ways, by its opposition proceedings or protest concerning RIMAC's applications abroad for counterparts to RIMAC's United States patent '928.  Even more specifically, in those proceedings abroad, WARF has asserted the priority of its claims to the compound 1 alpha-HCC, which was also claimed in RIMAC's counterpart applications.  Although my present knowledge on the point is limited and has been only minimally enhanced by the submissions of the parties on the present motion, I am not unaware that there may be

significant differences, from the viewpoint of a party in a position such as WARF's here, between electing to oppose someone's efforts to obtain counterpart patents abroad, on the one hand, and, on the other, electing to commence an action for infringement of a United States patent in United States courts. Also, I am aware that the time interval between much of WARF's oppositional conduct abroad and the filing of this lawsuit is substantial. Nevertheless, I have drawn the inference that as of November 15, 1985, RIMAC reasonably apprehended a probability that WARF would sue RIMAC if a licensee of RIMAC were to manufacture 1,25–DHCC or 1 alpha-HCC in the United States, using RIMAC's '928 process.

The major influences in my decision to draw that inference are two. The first is that there is a persistent, continuing pattern in WARF's oppositional activity abroad and that in Japan specific steps were being taken as recently as July 24, 1984. (For this purpose, I do consciously attribute to WARF the acts of the agent of its Japanese licensee.) The second is the fact that in the course of settlement negotiations, from 1982 to 1984, WARF has made clear repeatedly that in the absence of some overall settlement of its differences with RIMAC, WARF would oppose, in various forums, what WARF regards as RIMAC's invasion of turf protected by WARF's patents.[9]

This reasonable apprehension on RIMAC's part that it will face a lawsuit is sufficient to meet part (1)(a) of the modified *Indium* test and, therefore, to meet part (1) fully. However, RIMAC has also met part (1)(b), although less satisfactorily. There is a conspicuous absence of direct evidence from RIMAC's potential licensees. But there is evidence that: Upjohn told RIMAC that to take a license solely from RIMAC might well invite a lawsuit by WARF; North American Phillips told RIMAC that a dual licensing arrangement with RIMAC and WARF would not be economical and American Phillips would not risk an infringement suit at the end of the road; Merck told RIMAC that if Merck manufactured vitamin $D_3$ derivatives under the RIMAC process without taking a license from WARF, it was certain WARF would sue for infringement; U.S. Vitamin told RIMAC that U.S. Vitamin could not get involved with any "drug candidate" that was under attack and U.S. Vitamin would not risk litigation with WARF; and Ayerst Laboratories told RIMAC it was aware of WARF's opposition proceedings to RIMAC counterpart patent applications abroad and there was a substantial risk an infringement suit by WARF would result if Ayerst undertook a license from RIMAC under the '928 patent. These extrajudicial statements by these potential licensees are admissible hearsay as evidence of the declarants' state of mind. Fed.R.Evid. 803(3); 4 Weinstein and Berger, *Weinstein's Evidence* § 803(3)[03], at 803–112 n. 3 (1985). It is that state of mind which is crucial.

The weakness in RIMAC's proof in this respect is that, except for Ayerst, it is not explicit that it was conduct on the part of WARF which created the apprehension on the part of these potential licensees. However, RIMAC is not required to show that WARF made threats, whether express or implied, directly to these potential licensees. There is independent evidence of WARF's general aggressiveness as to its patent rights and independent evidence of its acts of opposition to RIMAC abroad with respect to the very WARF patents here in suit. A mild but proper inference is that the apprehension on the part of RIMAC's potential licensees was created in part by these activities of WARF.

To overcome the inferences I have drawn from RIMAC's evidence, WARF has produced no testimony from these potential licensees, or from any other source, negating apprehension on their part that WARF

---

9. Evidence of those settlement negotiations may be received for the purpose of determining whether WARF intends to block RIMAC in RIMAC's intended course of action. See Notes of Advisory Committee on Proposed Rules, as to Fed.R.Evid. 408.

would sue them or negating that the apprehension was created by WARF's conduct.

Thus, RIMAC has met both of the two alternative requirements of part 1 of the modified *Indium* test.

As to step (2)(b), as I have explained, I am persuaded of the market demand for 1,25–DHCC and 1 alpha-HCC and, on the record as thus far developed, of the simplicity, efficiency, and economy of RIMAC's '928 process. These factors combine to make it probable that one or more of RIMAC's potential licensees would proceed to use the '928 process to manufacture 1,25–DHCC and 1 alpha-HCC, assuming the consummation of a licensing agreement with RIMAC and assuming judicial elimination of the prospect of an infringement suit by WARF.

### B. *Based on the amended complaint*

If the question of the presence or absence of a case or controversy were to be determined presently, in response to WARF's Rule 12(b)(1) motion, solely on the basis of the allegations of the amended complaint, construed liberally in RIMAC's favor, there is no doubt that the question must be resolved in RIMAC's favor and WARF's motion must be denied. The assertion of subject matter jurisdiction is surely non-frivolous. But more than that, construed favorably to RIMAC, those allegations of the amended complaint meet both (a) and (b) of part 1, and (b) of part 2, of the modified *Indium* test.

### C. *Based on conversion to a Rule 12(b)(6) motion*

If, on its own initiative, the court were to treat the Rule 12(b)(1) motion as a Rule 12(b)(6) motion, assume the presence of subject matter jurisdiction, and inquire whether the amended complaint, construed liberally to RIMAC, states a claim upon which relief can be granted, there is no doubt that it does. This is true as to the allegations of invalidity of the patents-in-suit. Also, as to whether, in the exercise of its subject matter jurisdiction, the court should exercise its discretion to issue a declaratory judgment, the allegations of the amended complaint, liberally construed, must be considered adequate.

### D. *Based on conversion to a Rule 56 motion*

If, on its own initiative the court were to treat WARF's Rule 12(b)(1) motion as if it were a Rule 12(b)(6) motion, and if there were then presented by the parties all of the matter outside the pleadings which the parties have in fact presented in this case, and if the court were to decide not to exclude these matters, Rule 12(b), and if the court were then to proceed to treat WARF's motion as a motion under Rule 56 for summary judgment, there is no doubt it would be necessary to deny the motion.

With respect to the merits of the question of the validity of the patent-in-suit, obviously, WARF has not demonstrated that there is no genuine issue of material fact that the patents are valid.

If WARF's motion were conceived of as embodying a contention that on the basis of the material facts as to which there is no genuine issue, there is an absence of a case or controversy, summary judgment must be denied. There is surely no less than a genuine issue raised by RIMAC's factual submissions.

## V.   ORDER

It is ordered that defendant's motion, made pursuant to Fed.R.Civ.P. 12(b)(1), for an order dismissing count I of this action for lack of subject matter jurisdiction, is denied.