**SOCIETE de CONDITIONNEMENT en ALUMINIUM, Plaintiff-Appellant,**

v.

**HUNTER ENGINEERING CO., INC., Defendant-Appellee.**

No. 79–3014.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 6, 1980.

Decided April 9, 1981.

As Amended on Denial of Rehearing Aug. 19, 1981.

James P. Ryther, Chicago, Ill., argued, for plaintiff-appellant; Peter C. Smoot, Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Beverly Hills, Cal., Duglad S. McDougall, McDougall, Hersh & Scott, Chicago, Ill., on brief.

Robert T. Tobin, New York City, argued, for defendant-appellee; Kenyon, Reilly & Carr, New York City, Oliver F. Green, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., on brief.

Before CHOY and WALLACE, Circuit Judges, and HANSON,* District Judge.

WALLACE, Circuit Judge:

Societe de Conditionnement en Aluminium (SCAL) brought this action against Hunter Engineering Co., Inc. (Hunter) seeking a declaratory judgment that a patent owned by Hunter is invalid. Hunter moved to dismiss the action for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), Fed.R.Civ.P. The district judge granted Hunter's motion, holding that the court lacked subject matter jurisdiction because there was no case or controversy. SCAL appeals from this judgment and from the district judge's failure to admit certain deposition testimony into evidence. We reverse and remand.

I

Because the district judge made no findings of fact, we have taken our statement of facts from the record. Most of the facts are undisputed. We shall point out the areas of dispute.

SCAL, a subsidiary of Pechiney Ugine Kuhlmann of France, manufactures and sells aluminum products and metal working machinery. Hunter also manufactures and sells metal working machinery. Reynolds Metals Company (Reynolds) sells aluminum products and uses the metal working machinery sold by SCAL and Hunter. In 1976, Reynolds expressed interest in purchasing continuous roll casters,[1] and both Hunter and SCAL submitted proposals to Reynolds. Reynolds negotiated with both Hunter and SCAL through September 1977. SCAL's initial proposals did not include a "hold harmless" or patent indemnification clause, but did include an agreement to assist in case of patent litigation. This was SCAL's standard proposal. Reynolds responded according to its standard practice by requesting a hold harmless provision. Negotiations continued throughout the summer of 1977, but neither SCAL nor Reynolds would alter its position on the hold harmless provision.

In September 1977, Jim Hickam of Hunter made a phone call to W. J. Vogel of Reynolds that is the crux of this case. Vogel was responsible for procuring the continuous casting contract. Hickam was Technical Director of Hunter. Although Hickam was never an officer at Hunter, he had been identified to Reynolds as Vice President of Engineering and Production in a letter sent by George R. Vassily, Hunter's National Sales Manager and the person responsible for the continuous caster negotiations with Reynolds. Vogel understood

* Honorable William C. Hanson, United States District Judge, Southern District of Iowa, sitting by designation.

1. Continuous roll casters permit the production of continuous recrystallized sheets of metal. They consist of a pair of parallel casting rolls that are spaced slightly apart. Molten metal is poured through a nozzle into the space between the rolls. The metal solidifies between the rolls, and a metal sheet comes out the other side. The Hunter roll casters differ from the prior art by having larger rolls, which are driven at a faster speed, and by placing the nozzle farther back from the center line of the rolls. These features cause the resulting metal sheets to be of higher quality than those produced by prior casters. *See* United States Patent No. 4,054,173. We, of course, express no opinion on the validity of this patent, which is the subject of this litigation.

Hickam's capacity to be Technical Director. He testified, however, that "Hickam was the authority as to what they could guarantee and what they couldn't," while Vassily's job was sales. Vogel said that Vassily had to rely on Hickam when the conversation went beyond the standard, written guarantees.

Vogel's recollection of Hickam's phone call of September 12 is as follows:

> Mr. Hickam called me on the phone in an emotional state .... He was very concerned that we were about to order casters from SCAL. And he stated that they had been informed that the Patent Department was going to issue them a patent and that it would be printed on October 18. And he felt that the SCAL equipment would infringe on this patent. And he went on to say that he didn't care whether Reynolds bought the equipment or not if they wanted to give him a retirement annuity. He said he would take this patent to court and take every legal action available to them against Reynolds.

Vogel apparently took this conversation seriously. He advised Reynolds' legal department of the call. He indicated that "we were very concerned about this indicated threat from Hunter."

Vogel stated that after this phone call he again requested a hold harmless provision from SCAL. SCAL indicated that it did not think its competitors would hold Reynolds harmless. Vogel called Vassily, who told him that Hunter would agree to a hold harmless provision in the contract. Vogel stated that the hold harmless agreement "[a]t that point, ... was a very serious question with us," and that "if SCAL did not agree to hold us harmless, they weren't going to get the order either."

Shortly after the Hickam phone call, Kurt T. Braun, a Hunter Vice President, called Vogel to apologize for the "exchange of harsh words" between Vogel and Hickam. There was no mention made of a patent litigation threat.

No one at Hunter had ever explicitly authorized Hickam to speak for the compa-

ny concerning patent litigation. Hunter had a policy not to sue its customers, and a decision to sue would have been made by the Board of Directors. Hunter claims that no one at Hunter knew of Hickam's "threat" until SCAL filed its complaint in this case, and that immediately upon learning of the threat Hunter repudiated it. SCAL points out that Hunter has refused to forbear from any future threats or litigation concerning these patents.

In September 1977, a few days after Hickam's phone call, SCAL and Reynolds entered into a contract for the sale of continuous roll casters. The agreement contained a hold harmless provision. The parties are in dispute over what caused SCAL to agree to include a hold harmless provision in the agreement. Hunter claims that SCAL agreed only when it learned that Hunter had agreed to hold Reynolds harmless. SCAL argues that it agreed to the hold harmless provision only after Reynolds' position had hardened subsequent to the Hickam phone call. The parties have pointed to nothing in the record that indicates causation. Rather, the record merely reflects the chronological sequence of events. In addition, the parties have not called our attention to anything in the record that indicates when SCAL learned of the Hickam phone call.

## II

We must determine at the outset the scope of review of the district court's dismissal of the complaint for lack of subject matter jurisdiction. Despite Hunter's request, the district judge made no findings of fact or conclusions of law. With nothing but a bare order of dismissal before us, we are unable to determine upon which parts of the record the district judge relied or what legal standards he applied.

Questions of law are freely reviewable on appeal. *Miller v. United States*, 587 F.2d 991, 994 (9th Cir. 1978). Therefore, we may determine the proper legal standard for the determination of subject matter jurisdiction without giving deference to the standard applied by the district court. The

parties agreed on the legal standard to be applied. We assume that the district court applied this standard. Because of our conclusion that this standard was incorrect, *see infra,* we must next determine how that conclusion affects the disposition of this case.

It is not clear what evidentiary standard the district judge was applying in his determination of subject matter jurisdiction. The principles that we applied to determinations of personal jurisdiction in *Data Disc, Inc. v. Systems Technology Assocs., Inc.,* 557 F.2d 1280, 1284–86 (9th Cir. 1977), are equally applicable to determinations of subject matter jurisdiction. In *Data Disc* we said that "if a plaintiff's proof [of jurisdictional facts] is limited to written materials, it is necessary only for these materials to demonstrate facts which support a finding of jurisdiction in order to avoid a motion to dismiss." *Id.* at 1285. The record does not indicate whether the judge intended to put SCAL to its full proof on the jurisdictional issue, or only to proof of a prima facie case on jurisdiction.

It is appropriate for a court of appeals to examine a record to determine if the evidence is sufficient to "establish a prima facie showing of jurisdictional facts." *Id.* at 1286. Thus, we undertake this task in light of the legal standard set forth in this opinion. If the district judge was applying the prima facie standard in making his determination, then we may affirm his dismissal or remand the case for further proceedings pursuant to our analysis of the existence of a prima facie case.

If the district judge was using the preponderance of the evidence standard, then we can affirm his determination only if we determine that there are no facts that would support a finding of jurisdiction under the correct legal standard. If we should find that a prima facie case of jurisdiction has been made, then we must remand to the district judge to afford him the first opportunity of weighing the evidence under the proper legal standard to determine whether jurisdiction has been proven by a preponderance of the evidence.

The review of this case would have been significantly aided by findings of fact and conclusions of law. Rule 52 does not require a district judge to make findings and conclusions when dismissing for lack of subject matter jurisdiction. Fed.R.Civ.P. 52. *But cf.* 5A Moore's Federal Practice ¶ 52.08 at 2738–40 (arguing that a district judge must make findings when resolving questions of fact in determining subject matter jurisdiction). When the district judge looks beyond the pleadings to dismiss for lack of subject matter jurisdiction, it would be helpful, though probably not required, for him or her to make findings and conclusions.

## III

The Declaratory Judgment Act (the Act) permits a federal court to "declare the rights and other legal relations" of parties to "a case of actual controversy." 28 U.S.C. § 2201. The "actual controversy" requirement of the Act is the same as the "case or controversy" requirement of Article III of the United States Constitution. *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239–40, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937). Thus, the Act requires no more stringent showing of justiciability than the Constitution does.

We begin by referring to the now familiar general principles on the issue of case or controversy as applied to declaratory judgments:

> The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). Prior to *Maryland Casualty,* the Supreme Court had observed:

A "controversy" in this sense must be one that is appropriate for judicial determination .... A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. ... The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests.... It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.... Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages.

*Aetna Life Ins. Co. v. Haworth, supra,* 300 U.S. at 240–41, 57 S.Ct. at 463–64 (citations omitted).

The purposes of the Act have been aptly described by a United States district court:

The Declaratory Judgment Act was designed to relieve potential defendants from the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating suit at his leisure—or never. The Act permits parties so situated to forestall the accrual of potential damages by suing for a declaratory judgment, once the adverse positions have crystallized and the conflict of interests is real and immediate.

*Japan Gas Lighter Assoc. v. Ronson Corp.,* 257 F.Supp. 219, 237 (D.N.J.1966). In effect, it brings to the present a litigable controversy, which otherwise might only by tried in the future.

Declaratory relief is "indisputably appropriate" to patent cases. *Hanes Corp. v. Millard,* 531 F.2d 585, 592 (D.C.Cir.1976). The availability of declaratory relief serves both judicial efficiency and the policies underlying the patent laws. Before passage of the Act, a patentee had more protection for his invention than his statutory monopoly warranted. A patentee could chill competition by declaring that his competitors were infringing his patents and by threatening an infringement suit. Unless the patentee actually brought an infringement suit, questions of validity of the patent or infringement by competitors could not be adjudicated. Competitors might have no practical recourse except to enter into a licensing agreement or make some other arrangement with the patentee. *Crowell v. Baker Oil Tools,* 143 F.2d 1003, 1004 (9th Cir.), *cert. denied,* 323 U.S. 760, 65 S.Ct. 93, 89 L.Ed. 608 (1944); *Treemond Co. v. Schering Corp.,* 122 F.2d 702, 704 (3d Cir. 1941). Judge Learned Hand described invalid or overbroad patents as "scarecrows" in the art. *Bresnick v. United States Vitamin Corp.,* 139 F.2d 239, 242 (2d Cir. 1943). *See also Hanes Corp. v. Millard, supra,* 531 F.2d at 592. The Act permits competitors in some instances to eliminate these "scarecrows" without waiting to be sued.

In addition to promoting fair competition, the availability of declaratory relief in patent cases promotes judicial efficiency:

[T]he declaratory judgment action in patent matters [is] a means of avoiding multiplicity of actions and the endless delays and uncertainties which various suits in different jurisdictions testing different aspects of a broad patent controversy can entail.... The crowded dockets of our District Courts cannot tolerate this type of excessive and unproductive "guerilla warfare" litigation and the public's interest in certainty and prompt decision, particularly where potential competition may well be suppressed unnecessarily through the use of questionable patents, cannot be ignored.

*Windmoller v. Laguerre,* 284 F.Supp. 563, 564–65 (D.D.C.1968) (citations omitted).

The foregoing discussion of the policies concerning the applicability of the Act to patent cases does not, of course, help us decide whether a particular action is a case or controversy within the meaning of Article III. It does, however, assist us in for-

944

mulating a standard for making that determination. We infer from the arguments of the parties that they agree that an actual threat of litigation must be made by the patentee for a case or controversy to exist. We assume that the district court applied this standard in reaching its decision. We conclude that the Constitution has a much lower threshold than this standard would suggest.

The strongest statement that we have found that an actual threat of litigation is necessary for a case or controversy to exist for declaratory relief is in *Muller v. Olin Mathieson Chemical Corp.*, 404 F.2d 501 (2d Cir. 1968). In *Muller*, the court stated that "a justiciable controversy is present if defendant, the patentee, has charged plaintiff with infringement, or has threatened plaintiff with an infringement suit, either directly or indirectly." *Id.* at 504. This statement, on its face, provides a standard that is less strict than an actual threat of litigation. Indeed, the court in *Muller* went on to say that "the requirement that there has been a 'charge of infringement' has been given a very liberal interpretation." *Id.*

■ A better way to conceptualize the case or controversy standard is to focus on the declaratory judgment plaintiff. An action for a declaratory judgment that a patent is invalid, or that the plaintiff is not infringing, is a case or controversy if the plaintiff has a real and reasonable apprehension that he will be subject to liability if he continues to manufacture his product. *Japan Gas Lighter Assoc. v. Ronson Corp.*, supra, 257 F.Supp. at 237. *See also Super Products Corp. v. D P Way Corp.*, 546 F.2d 748, 753 (7th Cir. 1976); *Sherwood Medical Indus., Inc. v. Deknatel, Inc.*, 512 F.2d 724, 727 (8th Cir. 1975); *Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc.*, 439 F.2d 871, 874 (1st Cir. 1971).

We do not need to decide exactly what evidence of a real and reasonable apprehension is required in all cases to meet the case or controversy standard. We need only decide whether the record is sufficient in the case before us. We observe, however, that

something more is required than that the plaintiff manufactures a product similar to one for which the defendant owns a patent. It has been said that "the mere existence of the patent is not a cloud on title, enabling any apprehensive manufacturer to remove it by suit." Borchard, Declaratory Judgments 807 (2d ed. 1941). The purpose of this rule, of course, is to avoid harassment and vexatious lawsuits by infringers or colorable infringers against patentees. *Id.*

■ In a case like the one before us, in which the plaintiff is engaged in the on-going manufacture of the alleged patented item, the showing of real and reasonable apprehension beyond the manufacture of the patented item need not be substantial. The more acute case or controversy problem in the patent area arises when the plaintiff has not yet begun to manufacture, or make preparations to manufacture, the patented product. In that situation, the plaintiff is asking the court to render an advisory opinion whether its product would be infringing a valid patent if the plaintiff Hunter actually proceeds to the manufacturing stage. *See Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc.*, supra, 439 F.2d at 874–75; 6A Moore's Federal Practice ¶ 57.20 at 57–210–211 (2d ed. 1979). When the plaintiff is, as SCAL is, an actual manufacturer of a product that may infringe the patent owned by another, the adverse legal positions of the parties are more crystallized and the possibility that the court will be asked to render an advisory opinion on a set of hypothetical facts is minimized.

■ SCAL has developed a record sufficient to support a finding that a case or controversy exists under the standard. Hickam's call to Vogel at Reynolds in which he stated that he would take Reynolds to court for patent infringement if Reynolds purchased SCAL's equipment established a prima facie case or controversy. Hickam's statement was sufficient to put SCAL in a defensive posture with respect to its continued manufacture of continuous roll casters.

Although it is irrelevant whether this phone call caused the hold harmless provision to be included in the contract, we observe that the provision served to make SCAL liable if Hunter carried through with Hickam's threat against Reynolds, and the record does indicate that Hickam's call solidified Reynolds' position of desiring a hold harmless agreement from SCAL. Although the record does not indicate when SCAL learned of Hickam's phone call, SCAL's apprehension that it could be subject to liability for patent infringement appears real and reasonable.

It is not relevant that Hunter attempted to withdraw its "threat" after the filing of this lawsuit. We do think it relevant, in the light of the circumstances, that Hunter has not indicated that it will not sue SCAL for infringement or in any other manner agree to a non-adversary position with respect to the patent. Thus, dismissal of this suit would leave SCAL with the "Damoclean threat" of litigation hanging over its head. *See Japan Gas Lighter Assoc. v. Ronson Corp., supra*, 257 F.Supp. at 237.

It is not necessary to decide whether Hickam had the authority to make the statement to Vogel. Hunter argues that Hickam was authorized only to deal with technical questions, and not to threaten patent litigation. Under the real and reasonable apprehension test, however, this argument misses the point. If we were to focus on the patentee's conduct by requiring an actual threat of litigation, then such a threat would of course have to be made by one vested with actual, implied, or apparent authority by the patentee. *See Dr. Beck & Co. v. General Elec. Co.*, 210 F.Supp. 86, 90 (S.D.N.Y.1962), *aff'd*, 317 F.2d 538, 539 (2d Cir. 1963) (per curiam).

Under the real and reasonable apprehension test, the focus is on the customer or competitor, not on the patentee. Although in many situations, the same facts will support a finding of reasonableness that would support a finding of agency, agency is not the test for case or controversy.[2] One of the elements of reasonableness is whether it was reasonable for a listener to assume that the speaker was speaking for his company. In the case before us, Hickam had been identified to Reynolds as a Vice President for Engineering and Production. We do not need to decide whether this representation is sufficient to find ostensible authority. *See* Cal.Civ.Code § 2317. It was, however, combined with Vogel's apparent belief that Hickam was responsible for technical areas beyond the standard contract agreements, sufficient to demonstrate reasonableness. It was reasonable for Reynolds and later SCAL to believe that Hickam could threaten patent litigation on behalf of his company and to feel apprehensive about possible patent infringement based on Hickam's statements. That real and reasonable apprehension was sufficient for the prima facie determination. It is not required that either Reynolds or SCAL inquire about Hickam's authority or discover that Hunter had policies that precluded suing its customers and required the approval of the Board of Directors before threatening litigation. Had they done so, that would become a factor in determining whether the apprehension was reasonable. But under the facts of this case, there was no burden of inquiry. Whether such inquiry is required should be determined by whether, in the given factual situation, apprehension would be reasonable without it. With the focus on the real and reasonable apprehension that SCAL will be subject to liability if it continues to manufacture its product, jurisdiction is not determined by whether there was a threat by the patentee. Indeed, it is conceivable that a real and reasonable apprehension could occur without a threat. If there is one, it becomes part of the picture in determining whether real and reasonable apprehension has been demonstrated.

**2.** In so holding, we part company with at least the Eighth Circuit, which has adopted the reasonable apprehension test, but which requires that a person making statements causing such apprehension be authorized to make them.

SCAL also appeals from the district court's refusal to consider the deposition testimony of Hickam and former Hunter President Keith T. Romine.[3] Because we find that SCAL has made a prima facie case of jurisdiction without referring to these depositions, and whether the district judge will need to refer to these depositions on remand is at best speculative, we need not reach the question of their admissibility.

## IV

We conclude that SCAL has made its prima facie case of jurisdiction. If this is all the district judge required, then he erred in dismissing the case. If the district judge required SCAL to show jurisdiction by a preponderance of the evidence, then the district judge must reevaluate the evidence, or in his discretion hold a new hearing, in light of the legal standard announced in this opinion. We emphasize the desirability of the preparation of findings of fact and conclusions of law if the district judge makes such a reevaluation on the preponderance of the evidence standard.

REVERSED AND REMANDED.

---

*Sherwood Medical Indus., Inc. v. Deknatel, Inc.,* 512 F.2d 724, 727–28 (8th Cir. 1975).

**3.** Hickam and Romine left Hunter in November 1977 to join a competing firm, which they had apparently formed while still at Hunter. This has caused substantial litigation between Hunter, on one side, and Hickam, Romine, and their new company, on the other side. During both their depositions in the present litigation, their attorneys objected to questions posed by Hunters' counsel on cross-examination that related to the circumstances surrounding their leaving Hunter and forming their new company. Their attorneys' failure to permit them to answer these questions is one of the bases for Hunter's objection to the admission of these depositions into evidence. The other basis asserted by Hunter is that the depositions do not comply with Rule 32(a)(3) of the Federal Rules of Civil Procedure, because Hickam and Romine were within 100 miles of the court and were otherwise available to testify in person.