**BP CHEMICALS LIMITED, Plaintiff,**

v.

**UNION CARBIDE CORPORATION, Defendant.**

**No. 89 Civ. 6967(MGC).**

United States District Court, S.D. New York.

Feb. 26, 1991.

Brooks Haidt Haffner & Delahunty, New York City , Harold Haidt, G. Thomas Dela-

---

hunty, Charles G. Mueller, Ford F. Farabow, Jr., Michael C. Elmer, J. Michael Jakes, Joann M. Neth, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., of counsel, for plaintiff.

Fitzpatrick, Cella, Harper & Scinto, New York City by Joseph M. Fitzpatrick, Nicholas M. Cannella, Scott K. Reed, Thomas H. Beck, for defendant.

## OPINION AND ORDER

### CEDARBAUM, District Judge.

Plaintiff BP Chemicals Limited ("BP"), a British corporation, sues Union Carbide Corporation ("Carbide"), a New York corporation, for a declaratory judgment that Carbide's patent number 4,543,399 ("the '399 patent") is invalid, unenforceable and not infringed. Carbide moves to dismiss for lack of subject matter jurisdiction on the ground that there is no actual controversy between the parties and, in the alternative, urges the court to decline to exercise its discretionary jurisdiction over this suit under the Declaratory Judgment Act, 28 U.S.C. § 2201. BP has presented no evidence that Carbide ever threatened to sue BP itself, but argues that, nevertheless, an actual controversy exists because Carbide has threatened to sue BP's licensees. After an evidentiary hearing on the fundamental jurisdictional question, I find that there is no actual controversy between the parties because BP has not shown that its licensees have a reasonable apprehension of an infringement suit. Accordingly, defendant's motion to dismiss the complaint must be granted.

## BACKGROUND

Both BP and Carbide are in the business of licensing gas phase fluidized bed process technology for the manufacture of polyethylene. The two are the world's major suppliers of this technology. Licensing this technology is a multi-million dollar business for BP, which receives both fees and royalties from those who use its technology. BP does not itself produce polyethylene in the United States, but has licensed its technology for the production of linear low density polyethylene ("LLDPE") to three companies in the United States: Texas Eastman, Chevron Chemical Company ("Chevron"), and Quantum Chemical, Inc. ("Quantum"). BP competed directly with Carbide for these three licenses. Carbide's '399 patent relates to the "condensing mode" of producing LLDPE. This mode, when incorporated into gas phase fluidized bed technology, substantially increases the efficiency of production.

According to the complaint, Carbide has threatened BP's licensees and the LLDPE industry with lawsuits for infringement of the '399 patent. These threats, BP asserts, have inhibited its licensees from making full use of their licenses, and thus caused BP to lose revenue it would otherwise have earned under the licenses. Carbide maintains that it has never threatened to sue anyone for infringing the '399 patent.

## THE LEGAL STANDARD

The parties agree that the standard for an actual controversy in a declaratory judgment action concerning a patent has two elements. First, the defendant's conduct must have "created on the part of the declaratory plaintiff a reasonable apprehension that it will face an infringement suit if it commences or continues the activity in question." *Indium Corp. of America v. Semi–Alloys, Inc.*, 781 F.2d 879, 883 (Fed.Cir.1985). Second, "plaintiff must be engaged in an actual making, selling, or using activity subject to an infringement charge or must have made meaningful preparation for such activity." *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed.Cir.1988); *see also Indium*, 781 F.2d at 883. The legal standard is an objective one, and its elements must exist at the time the suit is filed. *Id.*

Plaintiff argues that the two-part test should be adapted to account for the fact that it does not itself use the potentially infringing technology in the United States but has licensed the technology to others for use in the United States. Plaintiff points out that in *Research Institute for Medicine and Chemistry, Inc. v. Wisconsin Alumni Research Foundation, Inc.*, 647 F.Supp. 761 (W.D.Wis.1986), Judge Doyle adapted the two-part test to a case in which the declaratory plaintiff alleged that the defendant threatened to sue it and its

potential licensees for patent infringement if the technology the plaintiff sought to license were utilized. Judge Doyle held that the first requirement is satisfied when the declaratory plaintiff reasonably apprehends that it would be sued if a potential licensee were to utilize the technology it seeks to license or when a potential licensee refuses to take a license because it reasonably apprehends that it would be sued if it were to utilize the licensed technology. Judge Doyle held that the second requirement is satisfied when a licensee has commenced the infringing activity or when a potential licensee would commence the activity if the threat of an infringement suit were judicially eliminated. *Research Institute*, 647 F.Supp. at 767. Plaintiff argues that the first requirement, as stated in *Research Institute*, should be modified further because this case involves actual licensees, not potential licensees, since no potential licensee has refused to take a license. Plaintiff contends that the first requirement should be satisfied when the declaratory plaintiff or its licensee reasonably apprehends that it would be sued if the licensee utilizes the license or when an actual licensee is unwilling to utilize the license because it reasonably apprehends that it would be sued if it does. For the purpose of this motion only, I will apply plaintiff's attenuated version of the *Research Institute* test.[1]

■ In deciding a motion to dismiss for lack of subject matter jurisdiction, a court may consider evidentiary matters outside the pleadings. *Indium*, 781 F.2d at 884. Because the documentary evidence presented conflicting accounts of several discussions in which Carbide officials allegedly threatened to sue BP's licensees, I held an evidentiary hearing on November 29, 1990 solely on the first element of the case or controversy test—whether BP's licensees had a reasonable apprehension of suit. Because plaintiff's allegations of jurisdiction have been challenged and an evidentiary hearing has been held, plaintiff bears the burden of establishing by a preponderance of the evidence that its licensees had a reasonable apprehension of suit. *See McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936) ("[T]he court may demand that the party alleging jurisdiction justify his allegations by a preponderance of evidence."); *Societe de Conditionnement en Aluminium v. Hunter Engineering Co., Inc.*, 655 F.2d 938, 942 (9th Cir. 1981); *Research Institute*, 647 F.Supp. at 770; *cf. CutCo Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986) (once an evidentiary hearing has been held, plaintiff has the burden of showing by a preponderance of the evidence that personal jurisdiction exists); *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (same); *Alexander & Alexander v. Donald F. Muldoon & Co.*, 685 F.Supp. 346, 351–352 (S.D.N.Y.1988) (same).

## THE FACTS

■ There is no evidence that Carbide has threatened to sue BP. Nor is there evidence that any potential licensee has refused a license from BP because it feared that it would be sued by Carbide. Instead, BP presented evidence that it argued would show that its licensees, Chevron, Texas Eastman, and Quantum, had a reasonable apprehension that Carbide would sue them for patent infringement if they utilized their BP licenses.

---

1. The policy reasons that support the *Research Institute* test do not seem to justify plaintiff's proposed expansion of that test. Allowing a licensor that has not itself been threatened with suit to bring a declaratory judgment action may serve the public interest in the invalidation of improperly granted patents in the situation presented in *Research Institute* because a potential licensee is unlikely to have sufficient incentive to challenge the patent's validity. But when a licensor has successfully licensed the potentially infringing technology, as BP has, the licensee's investment in that technology is likely to give it sufficient incentive to challenge the patent, if it feels threatened. In such a case, the public interest may be served adequately without broadening jurisdiction under the Declaratory Judgment Act to include a suit by a licensor that is not itself threatened. In any event, since I find, as discussed below, that BP has failed to show that its licensees had a reasonable apprehension of suit, it is unnecessary for me to determine whether the *Research Institute* test should be expanded.

## I. *The Evidentiary Hearing*

At the evidentiary hearing, BP called as witnesses Raymond Knowland, Managing Director of BP, and George T. Scott, Vice President and General Manager of the Olefins and Derivatives Division of Chevron Chemical Company, and, as a hostile witness, F. Donald Ryan, Carbide's general manager in charge of licensing polyethylene technology. Carbide's only witness was H. William Lichtenberger, President of Union Carbide Chemicals and Plastics, the Carbide subsidiary that licenses LLDPE technology.

### A. *The Knowland–Lichtenberger Discussions*

Knowland testified that he discussed Carbide's conduct toward BP's licensees at three face-to-face discussions with Lichtenberger. The first discussion occurred in London in the summer of 1988, just before Lichtenberger and his wife accompanied Knowland and his wife to the Wimbledon tennis tournament as the Knowlands' guests. At a meeting that lasted an hour and a half and covered several topics, including joint ventures between BP and Carbide, Knowland and Lichtenberger discussed polyethylene for ten to fifteen minutes. Knowland raised the subject, and John Turnbull, Chief Executive of BP's Petrochemicals and Polymers Division, explained on Knowland's behalf that BP was concerned about allegations by Chevron and Quantum that Union Carbide's licensing team was claiming that the '399 patent was very strong and would be protected in any way necessary. Transcript, p. 117. Knowland testified that Lichtenberger responded, "We have really got to follow that up," and suggested that Turnbull speak with Mr. Joyce at Carbide. Transcript, pp. 118–119. Turnbull and Joyce spoke several times but made no progress.

Sometime in 1989, BP set up a task force to look into the issues surrounding the '399 patent. Knowland testified that he met with his task force on June 21, 1989, and decided on that day to sue Carbide because the task force persuaded him that BP had "a strong case" that the '399 patent was

not valid and because the threats about which Knowland had complained to Lichtenberger "were still extant." Transcript, p. 123. No evidence was presented that any threats had been made by Carbide since Lichtenberger suggested that BP and Carbide discuss the issues surrounding the '399 patent. Knowland directed the task force to prepare a lawsuit but not to file it until he gave the order because he was concerned that the lawsuit might interfere with ongoing negotiations with Carbide regarding other matters. Transcript, p. 125.

The second discussion between Knowland and Lichtenberger about polyethylene occurred at an international conference of the chemical industry in Venice during the first week of October, 1989. Knowland testified that while waiting for a reception to begin, he took Lichtenberger aside and told him that BP "had come to the conclusion that [BP] had to take some action." Transcript, p. 127. Knowland did not testify that Lichtenberger responded to this statement.

The third discussion took place two weeks later, on October 17, 1989, in New York City, as Knowland and Lichtenberger were leaving a long meeting about an unrelated matter. Knowland testified that as he and Lichtenberger were walking toward the elevator, Lichtenberger took him by the arm, "made reference to our discussions in Venice by way of introduction, and said that he had come to the conclusion that in the best interests of Union Carbide he had to take action and sue Quantum." Transcript, p. 128.

After this discussion, Knowland returned to BP's offices in London. While driving from the airport to his office, Knowland spoke by car phone with Mr. Levitan, the head of BP's legal department. Knowland described to Levitan his discussion with Lichtenberger, and Levitan drafted a "Record Note of Discussion." Knowland subsequently edited Levitan's draft. Levitan's original draft with Knowland's handwritten changes as well as a later version incorporating Knowland's changes were presented at the hearing. According to the

original draft, Lichtenberger referred to Knowland's statement in the Venice discussion that BP Chemicals intended to commence proceedings against Carbide as follows:

"You know what you said to me in Venice? Well, I went back and told my guys. When I told him Joyce said "I said to Turnbull months ago that if we weren't careful this would happen. Now we're going to have to take action against Quantum". I said "That seems a bit stupid, why don't you ring BP." We ought to talk before it's too late".

Defendant's Exhibit 3 (punctuation in original). The last paragraph of the original draft continues:

(On 18th October 1989 JD Campbell, Chief Executive, Polymers & Petrochemicals Division received a message to call Joyce. On doing so Joyce said "There must be some way we can resolve this by co-operating on condensation". Campbell replied that he would certainly be willing to see what could be done but that the legal hounds had been loosed and legal action was under way in the US." To which Joyce replied "Well I suppose it will be necessary to do some strength evaluation before we can get into serious discussion." It was agreed that Campbell would revert to Joyce later in the week.)

*Id.* (punctuation in original).

After Knowland's editing, the record note entirely omits Lichtenberger's instruction to Joyce to call BP instead of suing. It reads:

When I told him Joyce said "I said to Turnbull months ago that if we weren't careful this would happen. You should know that we will be filing action against Quantum for infringement of our patent". We agreed that Joyce/Campbell should talk ASAP.

Defendant's Exhibits 2, 3. The revised version also omits the last paragraph of the original draft describing the telephone conversation between Campbell and Joyce.

Knowland admitted that he changed the record note after this lawsuit was commenced, Transcript, p. 150, and that it had been explained to him in June, 1989 that

BP needed to show that Carbide had threatened BP in order for BP to bring a lawsuit. However, he testified that he changed the original draft only because it was incorrect. Transcript, p. 151.

BP sued Carbide on October 18, 1989, the day after Knowland met with Lichtenberger in New York. Knowland explained that he gave the order to initiate the lawsuit "because I was extremely worried that what we had feared all along was going to happen, that Union Carbide would take action first and apparently give the impression that we were not prepared to protect our own licensees." I asked Knowland whether he had discussed protecting BP licensees by intervening if the licensees were sued. He answered,

But, Your Honor, that is the wrong way round for the marketplace. It appears that BP is being forced to react in that situation. What we wanted to do was to make sure that we had been seen to initiate action to protect our licensees. It's psychologically very negative, or at least in our judgment it was.

Transcript, p. 130. Knowland admitted that Lichtenberger's alleged threat to sue Quantum in the October 17th discussion was not the reason for BP's decision to sue Carbide because BP had decided in June to sue Carbide. Transcript, pp. 151–53.

Lichtenberger also testified about the three conversations with Knowland. He testified that he never threatened to sue Quantum. Instead, he repeatedly suggested that BP and Carbide discuss an amicable resolution of the problem.

According to Lichtenberger, Knowland raised the subject of polyethylene for the first time at the pre-Wimbledon discussion and said that BP and Carbide appeared to be heading for "a real potential conflict." Because he was unsure of what Knowland was talking about, Lichtenberger suggested that Joyce and Turnbull discuss the matter further. Transcript, p. 10. Lichtenberger testified that there was no mention of a specific patent or of a lawsuit. Transcript, p. 11.

Lichtenberger's account of the second discussion about polyethylene is consistent

with Knowland's. Lichtenberger testified that Knowland approached him and said that BP would have to challenge Carbide's patents but that he hoped the challenge would not affect the good business relationships between the two companies. Transcript, p. 12. Lichtenberger made no response at the time but, the next day, suggested that Campbell, who had replaced Turnbull, speak with Joyce "and see if we can't resolve the matter more amicably." Transcript, p. 13.

Lichtenberger testified that he initiated the third discussion by asking Knowland if he had asked Campbell to call Joyce. When Knowland replied that he had not, Lichtenberger asked where the matter stood, and Knowland said that BP was getting ready to sue Carbide. Lichtenberger observed that it seemed strange that BP would sue Carbide and asked whether this wasn't "really a problem for Union Carbide if one of BP's licensees were to infringe one of our patents, wouldn't that be then a problem for Union Carbide to take action against one of the licensees ... [?]" Transcript, pp 13–14. Lichtenberger testified that he was "absolutely sure" that he did not tell Knowland that Carbide intended to sue Quantum because Carbide has extensive business relationships with Quantum and "there is no way that we would ever contemplate suing somebody like that without having substantial discussions first to try to resolve the matter." Transcript, pp. 14–15. Lichtenberger further testified that his approval would be required before suit was brought against BP or its licensees and that he had not approved any preparations to sue Quantum for infringement of Carbide patents. Transcript, p. 16.

### B. *Carbide's Sales Meeting with Chevron*

Scott testified about a sales meeting with Carbide's polyethylene technology licensing team and a private meeting between him and Ryan on the same day in October of 1987. Scott stated that Ryan requested a sales meeting when Carbide learned that Chevron had taken an option on a license with BP. Scott testified that, in a private meeting after the sales meeting, Ryan told him that Carbide's patent was very strong and that Chevron could not afford to make the hexene copolymer resins that it intended to make under BP technology because it would not be able to use condensing mode technology. Scott testified that he interpreted Ryan's statements as a threat to sue. Transcript, p. 91. Scott could not remember the exact words Ryan used, but he remembered that Ryan did not use the word "sue." Transcript, pp. 91–92.

Ryan testified that he did not remember making any reference to the '399 patent at this private meeting. Transcript, p. 60. However, he remembered making similar statements at the sales meeting earlier in the day. He told the Chevron representatives that Carbide was in a strong position because it had a patent, that the latest tendencies of the courts are to uphold patents, and that the Carbide technology was necessary to operate an economically viable commercial system. Transcript, p. 58. Ryan estimated that he discussed Carbide's patents for one or two minutes during the seven or eight hours he spent with Chevron representatives that day. Transcript, p. 77. He denied threatening to sue Chevron if it took a BP license. Transcript, p. 77.

### II. *Other Evidence*

Prior to the evidentiary hearing, the parties submitted the following documentary evidence about events not addressed at the evidentiary hearing. These events all predate the discussions between Knowland and Lichtenberger.

### A. *Carbide's Sales Meeting with Texas Eastman*

Texas Eastman evaluated proposals from a number of companies, including Carbide, before selecting a license from ĿP. According to Thomas Smith, Division Superintendent for Polyethylene for Texas Eastman, Carbide requested a meeting with him in January of 1989, after it learned that Texas Eastman had decided to take a license from another company. Smith attests that at that meeting, Ryan mentioned that Carbide had a patent position on the operation of the gas phase process in the condensation mode. Smith Deposition, Ex.

8 to Plaintiff's Memorandum in Opposition, pp. 16–19. Ryan's version is that he presented a new licensing proposal to Texas Eastman during the meeting and that, toward the end of the meeting, he mentioned in passing that Carbide had patents that might be of interest to Texas Eastman. Ryan asserts that he did not know the identity of the company from which Eastman had decided to take a license and that he did not threaten Texas Eastman directly or indirectly with suit. Ryan Affidavit, ¶ 5.

### B. *Carbide's Discussions with Quantum*

In 1985, Quantum's predecessor, U.S. Industrial Chemical Company ("U.S. Industrial") obtained a license from BP for a polyethylene plant in Port Arthur, Texas. U.S. Industrial subsequently acquired Northern Petrochemical Company, Inc., which had a license from Carbide for a polyethylene plant in Morris, Illinois. U.S. Industrial became Quantum sometime in late 1987 or early 1988. In 1988, when Quantum decided to build a second reactor at the Morris, Illinois plant, it took a second license from Carbide. Martin Howard of BP stated at his deposition that Mr. Flaim of Quantum told him that Quantum had been unable to obtain reassurances from Carbide that it would not sue if Quantum's second reactor were operated using the condensing mode without a second license from Carbide. Howard Deposition, Ex. 2 to Plaintiff's Memorandum in Opposition, p. 148. However, Howard stated that he did not remember whether Flaim used the word "threat" and that Flaim did not identify whom he spoke with at Carbide. Howard Deposition, pp. 146–147.

### C. *The 1986 Industry Conference*

At an international conference on LLDPE in November of 1986, David James and other representatives of Carbide delivered a paper and answered questions relating to the gas phase fluidized bed process for making LLDPE. The paper reads in part:

The intentional condensation of a controlled amount of the cycle gas stream and its subsequent re-evaporation in the resin bed has resulted both in improved process operation and increased production capacity. The technology associated with this discovery is of such significance that it has been widely patented. (U.S. 4,543,399).

\* \* \* \* \* \*

For those who are not free to use condensing mode technology or who might choose to use 4–methyl–pentene–1 for other reasons, our studies showed that it was necessary to use a substantially greater amount of 4–methyl–pentene–1 in the reactor, compared to hexene–1, to achieve a given resin density. James Paper, Ex. 21 to Plaintiff's Memorandum in Opposition, p. 2/4. According to John Squire of BP, who attended the conference, James and the others highlighted Carbide's patent position on condensation technology and made it clear that manufacturers of LLDPE were not free to use condensation technology without prior discussion with Carbide. Squire Deposition, Ex. 23 to Plaintiff's Memorandum in Opposition, pp. 94–95. Squire and two other BP employees who attended the 1986 conference wrote memoranda in July of 1989 recording for the first time alleged threats at the 1986 conference. These memoranda were written shortly after BP decided to sue Carbide. Exs. 25, 26, 27 to Plaintiff's Memorandum in Opposition. One of the authors admitted that he wrote his memorandum only after he was told by Squire that nothing was likely to happen with the patent suit against Carbide unless BP could show that Carbide had made threats. Turtle Deposition, Ex. U to Affidavit of Nicholas Cannella, April 12, 1990, pp. 53–54.

### CONCLUSION

Based on the testimony of the witnesses, the exhibits introduced at the evidentiary hearing, and the other evidence submitted by the parties, I find that plaintiff has not established by a preponderance of the evidence that its licensees had a reasonable apprehension of suit at the time it filed this

action. BP's allegations that Carbide threatened the industry and its licensees concern events that are too remote to support its decision to sue, and its evidence of those allegations is equivocal at best. In support of its allegations that Carbide threatened the industry at the 1986 conference, BP presents records created long after the threats were allegedly made and shortly after BP had decided to sue Carbide, a coincidence which raises substantial doubt about the accuracy of the memory of the recorders and of BP's records. BP's evidence that Ryan threatened its licensees at sales meetings was controverted by Ryan's testimony, which I accept as true because he was a credible witness. In addition, the so-called threats at the industry conference and at sales meetings significantly predated this lawsuit. Any apprehension of suit should have been assuaged by the passage of time and by Lichtenberger's repeatedly expressed desire to resolve any problems amicably.

The only allegation of a recent threat by Carbide is Knowland's testimony that Lichtenberger threatened to sue Quantum on October 17, 1989, an allegation that Lichtenberger denies. After carefully listening to all of the testimony, observing the demeanor of the witnesses, and evaluating the witnesses' credibility, I find that Lichtenberger was a very forthcoming and credible witness, and I accept his testimony as true and accurate. His description of his third discussion with Knowland is consistent with his undisputed conduct in the two previous discussions. His account is also supported by Levitan's original draft of the BP record note. I do not find Knowland's testimony about the third discussion credible. Knowland was the only source of Levitan's original draft. Knowland revised the record note after this lawsuit was filed. He admitted that BP sued Carbide because "[w]hat we wanted to do was to make sure that we had been seen to initiate action to protect our licensees." He also conceded that the third discussion was not the reason for BP's decision to sue Carbide. I find that this suit was brought as part of a marketing strategy to "show the flag" to licensees and potential licensees. Nothing that happened in October of 1989 contributed to BP's decision to bring this suit because that decision was made firmly on June 21, 1989.

BP has not shown that at the time it commenced this action its licensees had a reasonable apprehension of suit by Carbide. Accordingly, Carbide's motion to dismiss the complaint is granted for lack of an actual controversy between the parties.

SO ORDERED.